■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MELISSA M. STRAWBRIDGE, Appellant. [751 NYS2d 606] —Spain, J.

Appeal from a judgment of the Supreme Court (Lamont, J.), rendered March 31, 2000 in Albany County, upon a verdict convicting defendant following a nonjury trial of the crime of murder in the second degree.

Following a nonjury trial, defendant was convicted of depraved indifference second degree murder (*see* Penal Law § 125.25 [4]) for the death of her baby girl shortly after giving birth without assistance at home in the Village of Altamont, Albany County, on the evening of March 24, 1997. The proof adduced at the trial of this tragic case established that defendant, then age 21, had left a long-term, apparently troubled relationship and was living with her parents. She was newly employed as a temporary claims processor at Community Health Plan (hereinafter CHP), a health maintenance organization, and was offered and accepted a permanent position. During the required preemployment physical by a CHP physician's assistant (hereinafter PA) on February 21, 1997, defendant appeared to the PA to be pregnant, which defendant denied. The PA summoned a CHP obstetrical nurse practitioner (hereinafter ONP), who defendant agreed to let examine her, and a fetal heartbeat was detected. Defendant told them that she did not want the baby and wanted "to get rid of it," and she was told that she was probably too far along to terminate the pregnancy. Defendant then accompanied the ONP to the obstetrical department and learned, after an ultrasound, that she was approximately eight months pregnant and blood work was performed. The PA advised her of all of her options, prescribed prenatal vitamins, offered help and conveyed that defendant was required to produce a physician's note indicating that she was cleared to continue working without restrictions. Defendant expressly opposed telling her parents (or anyone else), concerned, among other things, about disappointing her parents and keeping her job, and the PA and ONP agreed to keep her pregnancy confidential.

When defendant thereafter failed to produce the required medical clearance, the PA and a CHP social worker and other CHP employees met with her on March 5, 1997 and informed her that she could not continue to work without a physician's note; these individuals learned that she had not told anyone of her pregnancy and offered her advice and help and discussed her plans for labor and delivery. Defendant agreed to be, and was thereafter, treated that day by the ONP who examined her, took her medical history and medically authorized defendant to continue working without restriction. The ONP testified that she told defendant that the ultrasound revealed cysts

on the baby's kidney for which she should see a physician. Although she told defendant that the condition was not "unusual," the ONP denied telling defendant it was a serious or potentially fatal problem. In a letter written by defendant to the baby's father, which was introduced into evidence at trial, defendant stated that the medical staff at CHP told her that the baby would die at birth because the baby had cysts on her kidneys and because defendant had tested positive for B-strep. Defendant also reported in the letter that she was scared, had not felt the baby move in a week, and believed the baby was dead inside her.

According to defendant's oral and written accounts provided on March 26, 1997 to Town of Colonie Police and the State Police regarding what had occurred, she left work and went home at approximately 4:00 P.M. on Monday, March 24th after experiencing constant "stomach" pain all day. She ate dinner with her parents, retreated to her own bedroom around 7:00 P.M. and, around 10:00 or 11:00 P.M., defendant felt like she had to go to the bathroom. She went into her own bathroom, alone, sat down on the toilet and the baby "came out" and fell into the toilet; the baby looked bluish-purple and did not cry. The baby moved a little, either when she fell into the toilet and/or when defendant picked her up momentarily after birth. Frightened, defendant "put, dropped" the baby back into the toilet, cleaned herself, and then picked up the baby—who was not moving—and placed her in double plastic bags, tied a knot, and placed the bag on the floor next to the toilet. Defendant recounted that she was very scared, unaware of what she was doing and that she did not know what to do. Her parents were apparently home at the time, sleeping and unaware of what was happening. Defendant then stated that she returned to bed and the next morning, March 25th, she called work, reported that she was sick, took the bag containing the baby and placed it in a dumpster in a nearby apartment complex, and then returned home to bed. When the ONP called her at home that day, defendant represented that she was still pregnant and had no symptoms of being in labor. On the afternoon of March 26th, defendant returned to work and her supervisor, alarmed that defendant appeared to no longer be pregnant, summoned the PA who, in turn, called the ONP and social worker. When confronted about the whereabouts of the baby, defendant misrepresented that she had delivered in another part of the state and that the baby was with the prospective adoptive parents. The social worker called the Statewide Central Register Hotline, which declined to take a report, and then she called the Colonie Police, who arrived at CHP at approximately 2:55 P.M.

Defendant initially told a Colonie Police investigator and a police youth referral aide a comparable false account of the baby's whereabouts, which they were unable to confirm, and defendant agreed to take them to the baby's location. However, while alone with the youth referral aide, defendant admitted having given birth alone at home and placing the baby in a bag. Since the investigation appeared to be outside of the jurisdiction of the Colonie Police, defendant agreed to accompany the police to the State Police barracks, where defendant arrived at around 5:00 P.M. A State Police investigator read defendant her *Miranda* rights and defendant thereafter provided an account of what had occurred, later reduced to writing, and consented to a search of her car and home. After initially taking the State Police to an incorrect location, defendant directed them to the apartment complex where the baby's body was found in the plastic bag in the dumpster with the umbilical cord and placenta still attached.

Barbara Wolf, a board-certified forensic pathologist, performed the autopsy on the baby and testified that the baby was full term and that there was no evidence of trauma or injuries and no congenital abnormalities. She opined from her examination of the baby's lungs that the baby had been born alive and had breathed on its own for at least two minutes. Wolf concluded that the cause of death was "asphyxia due to birth into [a] toilet and placement in a plastic bag," i.e., asphyxia due to the mechanism of drowning or suffocation, a conclusion based in part upon defendant's admission to placing the baby in a plastic bag. She also determined that at birth the baby had congenital pneumonia due to a preexisting infection in the placenta and umbilical cord, which, she conceded, can cause a fetus to be stillborn or be fatal to a newborn even if the birth occurs in a sophisticated hospital setting. While Wolf found no evidence of aspirated material other than amniotic fluid in the baby's lungs, such as maternal blood or toilet water, to confirm asphyxia by drowning in the toilet, she testified that the absence of such findings did not exclude asphyxia by drowning and that there may be no physical findings necessarily associated with drowning or suffocation as mechanisms of asphyxia when death occurs rapidly. Wolf also conceded that there was no scientific proof that the child was alive when defendant placed her in the bag. Kristina Keough, a perinatal pathologist who is board certified in clinical and anatomic pathology, examined specimen slides and essentially concurred with Wolf's conclusions.

Donald Singer, a pediatric pathologist with a specialty in

perinatal pathology who is board certified in anatomic, clinical and pediatric pathology, concluded that the baby was stillborn, i.e., she was not born alive. He testified on behalf of defendant that the cause of the fetus's death was the severe, systemic infection in the placenta and amniotic fluid which the fetus aspirated while in utero, causing severe pneumonia in her lungs. He opined that it was not scientifically possible to discern whether the fetus took any breaths on its own, and there was no medical evidence supporting the conclusion that the fetus suffocated due to being placed in a bag or drowned, as there would have been evidence, such as pinpoint hemorrhages in the body tissue or organs, cell death or water in the lungs.

Upon Supreme Court's verdict convicting defendant of murder in the second degree, defendant was sentenced to 19 years to life imprisonment. Defendant appeals, raising issues addressed to the partial denial of her pretrial motion to suppress statements she made to police, the erroneous admission of certain evidence and testimony protected by the physician-patient privilege, the sufficiency and weight of the evidence and the severity of her sentence.

Initially, we disagree with defendant's claims that County Court (Rosen, J.) erred, following a lengthy *Huntley/Mapp* hearing, in failing to suppress certain statements she made to police on March 26, 1997. The testimony elicited at the hearing fully supported the court's conclusion that the questioning of defendant by Colonie Police in the conference room at CHP was genuinely investigative and noncustodial up until approximately 4:10 P.M., when defendant first admitted giving birth at home and disposing of the baby in a plastic bag. Prior to that point, police had no information as to the baby's fate or that defendant had committed any crime, defendant was not arrested or accused of any wrongdoing, and defendant did not request to leave or raise objections to answering their nonaccusatory questions, which were clearly aimed at confirming the safe whereabouts of a newborn baby (*see People v Bolarinwa*, 258 AD2d 827, 828, *lv denied* 93 NY2d 1014). Taking into account defendant's having given birth two days earlier, there is no proof that defendant was deprived of food, water, medical attention or an attorney or threatened or coerced by anyone in law enforcement that day, and the fact that the Colonie Police addressed defendant about their inability to confirm defendant's accounts of having given birth in a specific out-of-town hospital and that the baby was being cared for by a paternal relative did not alter the investigative, noncustodial nature

and atmosphere of the questioning. However, County Court properly suppressed statements made by defendant at CHP subsequent to her initial incriminating admission to the police youth referral aide, where the police failed to thereafter provide her with *Miranda* warnings, concluding that, in light of the totality of the circumstances, the questioning then became interrogational and custodial as "a reasonable person would not have felt free to leave after implicating herself in potential wrongdoing" (*see People v Centano*, 76 NY2d 837, 838; *People v Yukl*, 25 NY2d 585, 589, *cert denied* 400 US 851; *People v Bolarinwa, supra* at 828; *People v Hardy*, 223 AD2d 839, 840-841).

The hearing testimony further established that defendant thereafter voluntarily agreed to accompany the police from CHP to the State Police barracks. After exiting the CHP building where she had been questioned, defendant was permitted to walk unescorted to her desk in a separate CHP building and, after a while, defendant returned of her own accord to the unmarked Colonie Police vehicle where the police were waiting, and she was taken without physical restraint to the State Police barracks, arriving at approximately 5:00 P.M. A State Police investigator took defendant into a conference room, advised her of her *Miranda* rights and spoke with her for about one-half hour. The Colonie Police investigator then joined them, defendant again received *Miranda* warnings and, by approximately 7:14 P.M., defendant gave a statement which was reduced to writing. Defendant ultimately directed them to the correct location where the baby's body was found.

We agree with County Court's conclusion that following the custodial questioning of defendant without warnings at CHP, there was "a definite, pronounced break in the interrogation [such] that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning" (*People v Chapple*, 38 NY2d 112, 115; *see People v Bethea*, 67 NY2d 364, 367-368; *People v Ripic*, 182 AD2d 226, 236, *appeal dismissed* 81 NY2d 776). Accordingly, defendant's oral and written statements provided to State Police after the administration of *Miranda* warnings were admissible, and we find that none of defendant's contentions directed at County Court's pretrial suppression ruling has merit.

Defendant also assigns error to Supreme Court's evidentiary ruling permitting the introduction at trial of extensive testimony and medical records by CHP employees in violation of her physician-patient privilege (*see* CPLR 4504 [a]). While we find that there is some merit to this contention, we also

conclude that there is not a "significant probability" that the finder of fact would have acquitted defendant but for this error and, thus, the nonconstitutional error was harmless and does not require reversal of the conviction (*see People v Crimmins*, 36 NY2d 230, 242; *People v Ballard*, 173 AD2d 480, *lv denied* 78 NY2d 961). This statutory privilege, which applies in criminal proceedings (*see People v Carkner*, 213 AD2d 735, 737, *lvs denied* 85 NY2d 970, 86 NY2d 733), prohibits physicians and other medical personnel, in the absence of a waiver by the patient, from revealing "any information which [they] acquired in attending a patient in a professional capacity, and which was necessary to enable [them] to act in that capacity" (CPLR 4504 [a]; *see People v Sinski*, 88 NY2d 487, 491; *Dillenbeck v Hess*, 73 NY2d 278, 283-284). It has often been recognized that the privilege is to be given a " 'broad and liberal construction to carry out its policy' " (*Matter of Grand Jury Investigation of Onondaga County*, 59 NY2d 130, 134, quoting *Matter of City Council of City of N.Y. v Goldwater*, 284 NY 296, 300; *see Matter of Grand Jury Investigation in N.Y. County v Morgenthau*, 98 NY2d 525), and courts have "narrowly construed statutes limiting the privilege and rejected claims that there is a general public interest exception to CPLR 4504" (*People v Sinski*, *supra* at 492).

Here, we find no error in the admission of testimony from defendant's nonmedical coworkers and supervisors concerning observations of defendant or statements by her because they were clearly not "acquired in attending a patient" (CPLR 4504 [a]). However, considerable testimony and related medical records of defendant were improperly adduced from the PA, the ONP and the social worker who treated defendant in her pregnancy (*see* Education Law § 6542; CPLR 4504, 4508). While the privilege did not attach at the inception of the preemployment examination of defendant by the PA and ONP on February 21, 1997, which was for the purpose of examining defendant as an employee for CHP—including confirming and dating her pregnancy and the need for a note from a treating physician clearing her to continue working (*see Forrester v Zwanger-Pesiri Radiology Group*, 274 AD2d 374, 374; *Heller v Peekskill Community Hosp.*, 198 AD2d 265, 265-266)—the privilege plainly attached to the information thereafter obtained by these medical personnel and their communications with defendant in attending to and treating her pregnancy in their professional capacities. It also applied to the process of advising her, monitoring her psychological acceptance and preparedness and her support network and birthing plan, as their patient, all matters patently exceeding a mere confirmation of her pregnancy

and health status for employment purposes (*see People v Sinski, supra* at 495; *see also Matter of Grand Jury Investigation in N.Y. County v Morgenthau, supra*; *cf. White v Southside Hosp.*, 281 AD2d 474, 475). Also, the testimony reflects that the communications and medical information were a necessary incident to medically treating defendant, were confidential in nature and defendant expressly contemplated that they would be kept confidential (*see Desai v Blue Shield of Northeastern N.Y.*, 146 AD2d 264, 266).

Contrary to the People's contentions, defendant neither expressly waived the privilege nor affirmatively placed her medical or psychological condition in issue at trial so as to waive the privilege as to all confidential communications and medical records (*see People v Carkner, supra* at 737; *see also Dillenbeck v Hess, supra*; *People v Jackson*, 244 AD2d 757, 757-758, *lv denied* 91 NY2d 926). To be sure, defendant did voluntarily disclose certain information to police during questioning on March 26, 1997—such as the fact that she had been pregnant and gave birth, some of the details of the birth, the identity of the father and the circumstances of learning that she was pregnant—which constituted a waiver of the privilege only as to that information (*see Farrow v Allen*, 194 AD2d 40, 44; *People v Pagan*, 190 Misc 2d 474, 476). However, the extensive testimony of CHP medical personnel and related medical records pertaining to their treatment of defendant's pregnancy beyond the preemployment physical remained privileged and should not have been admitted at trial.

To the extent that Supreme Court—in ruling that all of the testimony and records were admissible—relied upon Family Ct Act § 1046 (a) (vii), a recognized statutory exception to the privilege (*see People v Sinski*, 88 NY2d 487, 491, *supra*), this was error. That exception is applicable to child abuse or neglect proceedings in Family Court, and presupposes one of the critical disputed issues at this trial, namely, whether defendant's baby was born alive. However, we also recognize that Social Services Law § 413 (1) requires health care providers to report, or cause to be reported, when they have "reasonable cause to suspect" abuse or maltreatment of a child when a parent comes before them in their professional or official capacity and provides information that, if correct, would render a child to be abused or maltreated (*see* Social Service Law §§ 413, 415). This exception applies to a criminal proceeding involving the death of a child and, inasmuch as it requires only "reasonable cause" to believe a baby has been born alive, the exception authorized the disclosures by CHP medical personnel concern-

ing defendant's condition on March 26, 1997 (*see People v Trester*, 190 Misc 2d 46, 48; *People v Gearhart*, 148 Misc 2d 249; *People v Bass*, 140 Misc 2d 57; *see also Matter of Grand Jury Investigation in N.Y. County v Morgenthau, supra*; Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C4504:4, at 635). In any event, in view of the overwhelming record evidence of defendant's guilt, we find that the errors in admitting privileged information and communications with defendant were harmless (*see People v Crimmins*, 36 NY2d 230, *supra*).

We next turn to defendant's challenges directed at the verdict. Under Penal Law § 125.25 (4), added in 1990,\* a person commits murder in the second degree when that person is 18 years old or more and, "[u]nder circumstances evincing a depraved indifference to human life, [he or she] recklessly engages in conduct which creates a grave risk of serious physical injury or death to another person less than eleven years old and thereby causes the death of such person" (*see People v Cole*, 85 NY2d 990, 992). Defendant challenges the legal sufficiency as well as the weight of the evidence of this crime in three respects: that her conduct was reflective of depraved indifference to human life or that she acted with requisite extreme recklessness; that the baby was born alive; and that her actions caused the death of the baby. The culpable mental state or mens rea for depraved mind murder is "recklessly," which refers to defendant's awareness and conscious disregard of a substantial and unjustifiable risk (*see* Penal Law § 15.05 [3]; § 125.25 [2], [4]; *People v Register*, 60 NY2d 270, 275-276, *cert denied* 466 US 953). The act proscribed by subdivision (4) is defined by the degree of danger presented, i.e., defendant must have "create[d] a grave risk of serious physical injury or death," which conduct must have occurred "[u]nder circumstances evincing a depraved indifference to human life" (Penal Law § 125.25 [4]). The requirement of "circumstances evincing a depraved indifference to human life" refers to the "factual setting in which the risk creating conduct must occur" (*People v Register, supra* at 276), which "focuses not on the subjective intent of the defendant, 'but rather upon an objective assessment of the degree of risk presented by defendant's reckless conduct'" (*People v Sanchez*, 98 NY2d 373, 379-380, quoting *People v Register, supra* at 277). The recklessness sufficient to establish manslaughter, i.e., disregarding a "substantial and

---

\* Penal Law § 125.20 (4), §§ 120.12 and 120.05 (8) are all designed to enhance the crimes and penalties for assaults by adults on children under 11 years old which cause death or injury (*see* L 1990, ch 477).

unjustified risk" of death (Penal Law § 15.05 [3]; § 125.15 [1]), has been distinguished from the extreme or egregious recklessness required for depraved mind murder, i.e., disregarding a "grave risk" of death or of serious physical injury (Penal Law § 125.25 [2], [4]), by the requirement of proof of aggravating circumstances, objectively assessed, manifesting a depraved indifference to human life, i.e., an "exceptionally high" or "very substantial" unjustified risk of death (*see People v Register*, *supra* at 276-279).

Addressing defendant's claim that the evidence was legally insufficient, we view the evidence in the light most favorable to the prosecution—including defendant's admission to police that shortly after the birth she placed the baby in the plastic bag and sealed it and the People's expert testimony that the baby was born alive and that the cause of death was asphyxia resulting from defendant's actions—and find that there was a valid line of reasoning and permissible inferences from which the trier of fact could have found defendant guilty of depraved mind murder (*see* Public Health Law § 4130 [1]; *People v Sanchez, supra; People v Bleakley*, 69 NY2d 490, 495; *People v Contes*, 60 NY2d 620, 621; *People v Register, supra* at 276-279; *People v Hayner*, 300 NY 171, 174; *People v Zabala*, 290 AD2d 578, 578-579, *lv denied* 97 NY2d 735; *People v Hall*, 158 AD2d 69, 77-81, *lvs denied* 76 NY2d 940, 1021).

Moreover, upon our independent review of the evidence, while a different finding would not have been unreasonable—for example, a finding that the child was stillborn or died from congenital pneumonia unrelated to defendant's actions or that defendant did not act with the requisite extreme recklessness—we cannot conclude that the verdict was contrary to the weight of the evidence (*see People v Bleakley, supra* at 495). We have extensively reviewed and are troubled by the sharp and critical conflicts in the expert testimony—all of it seemingly provided by competent and highly experienced pathologists—regarding the issue of whether the baby was born alive or was stillborn and pertaining to the cause of death, i.e., asphyxia attributable to defendant's actions as opposed to congenital pneumonia attributable to an amniotic infection. However, we cannot assign error in the trier of fact crediting the People's experts over that of defendant's experts, finding deference to be appropriate to the factfinder's opportunity to hear and observe these witnesses (*see id.*; at 495; *People v Bolarinwa*, 258 AD2d 827, 831-832, *supra; People v Tinning*, 142 AD2d 402, *lv denied* 73 NY2d 1022). Likewise, the factfinder did not unreasonably conclude, from all of the evidence presented, that defendant

acted with extreme recklessness contemplated by the depraved mind murder statute and that, viewed objectively, defendant's actions manifested a depraved indifference to the life of her newborn baby (*see People v Register, supra; see also People v Sanchez, supra; People v Poplis*, 30 NY2d 85).

Finally, we are persuaded that the extenuating and extraordinary circumstances under which defendant's conduct occurred, immediately following giving birth without assistance at home, warrant reducing her sentence, in the interest of justice, to 15 years to life imprisonment (*see* CPL 470.15 [6] [b]; 470.20 [6]; Penal Law § 70.00 [2] [a]; [3] [a] [i]; *see also People v Warnick*, 215 AD2d 50, *affd* 89 NY2d 111; *People v Ellwood*, 205 AD2d 553, *lv denied* 84 NY2d 907). In so doing, we have considered the many mitigating factors, including defendant's youth, her lack of any criminal history, her positive educational and employment record, her documented impaired emotional and mental health and the psychiatric evidence submitted by defense counsel at sentencing (*see* CPL 390.30). We also give weight to her apparent lack of insight and her obvious inability to accept and cope with her condition or to utilize available sources of support, both professional and familial. In our view, the sentence as reduced is lengthy, but commensurate with the unique circumstances of this case.

Cardona, P.J., Mercure, Carpinello and Lahtinen, JJ., concur. Ordered that the judgment is modified, as a matter of discretion in the interest of justice, by reducing the sentence imposed to 15 years to life imprisonment, and, as so modified, affirmed.