(February 11, 2004)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EUNICE M. BAKER, Appellant. [771 NYS2d 607]—

Rose, J. Appeal from a judgment of the County Court of Tioga County (Sgueglia, J.), rendered April 7, 2000, upon a verdict convicting defendant of the crime of murder in the second degree.

After a three-year-old child died while defendant was babysitting in the child's home, she was charged with both intentional and depraved indifference murder. At trial, the evidence established that, on a warm summer night, the victim died of hyperthermia as a result of her prolonged exposure to excessive heat in a bedroom of her foster parents' apartment. The excessive heat was caused by the furnace having run constantly for many hours as the result of a short circuit in its wiring. The victim was unable to leave her bedroom because defendant engaged the hook and eye latch on its door after putting her to bed for the night. Defendant then remained in the apartment

watching television while the furnace ran uncontrollably. The victim's foster parents and another tenant testified that when they returned in the early morning hours and found the victim lifeless in her bed, the living room of the apartment where defendant sat waiting for them felt extremely hot, like an oven or a sauna, and the victim's bedroom was even hotter. Temperature readings taken later that morning during a police investigation while the furnace was still running indicated that the apartment's living room was 102 degrees Fahrenheit, the victim's bedroom was 110 degrees Fahrenheit and the air coming from the vent in the bedroom was more than 130 degrees Fahrenheit.

In characterizing defendant's role in these events, the prosecutor argued that the key issue for the jury was whether or not defendant had intended to kill the victim. The prosecution's proof on this issue consisted primarily of the second of two written statements given by defendant to police during a four-hour interview conducted a few hours after the victim was found. In the first statement, defendant related that she had been aware of the oppressive heat in the victim's bedroom, kept the victim latched in because the foster parents had instructed her to do so,* had not looked at or adjusted the thermostat even though the furnace was running on a hot day, heard the victim kicking and screaming to be let out and felt the adverse effects of the heat on herself. The second statement, which defendant disavowed at trial, described her intent to cause the victim's death by turning up the thermostat to its maximum setting, closing all heating vents except the one in the victim's bedroom and placing additional clothing on the victim which she then removed after the victim died. Because these actions differed from those described in the first statement and each reflects an intent to kill the victim, the jurors' initial task, as proposed by the prosecutor during summation, was to decide which statement they would accept.

After trial, the jury acquitted defendant of intentional murder (*see* Penal Law § 125.25 [1]), thereby rejecting the second statement, and instead convicted her of depraved indifference murder of a child (*see* Penal Law § 125.25 [4]). County Court sentenced her to a prison term of 15 years to life, and she now appeals.

Initially, we are unpersuaded that the prosecutor's summation improperly impugned defendant's credibility. Given the

---

* Although both foster parents denied having told defendant to utilize the eyehook, a former babysitter testified that the parents themselves had previously latched the victim in her bedroom.

contradictions between defendant's testimony disavowing her second statement and the testimony of the officer who prepared that statement, the prosecutor's portrayal of the issue for the jury as being whether defendant or the police officer had lied represents a fair commentary on the evidence (*see People v Jones*, 283 AD2d 665, 668 [2001], *lv denied* 96 NY2d 903 [2001]; *People v Hughes*, 280 AD2d 694, 696 [2001], *lv denied* 96 NY2d 801 [2001]; *cf. People v Russell*, 307 AD2d 385, 386 [2003]). In any event, defendant demonstrated no resulting prejudice as the jury acquitted her of the intentional murder charge founded upon the second statement (*see People v Ciborowski*, 302 AD2d 620, 622-623 [2003], *lv denied* 100 NY2d 579 [2003]; *People v Alexander*, 255 AD2d 708, 710 [1998], *lv denied* 93 NY2d 897 [1999]).

To the extent that defendant also challenges the effectiveness of her trial counsel, the record here confirms that he provided more than meaningful representation at trial by making timely and proper objections, carefully questioning defendant, vigorously cross-examining the prosecution's witnesses and persuading the jury to disregard the second statement. His efforts resulted in defendant's acquittal on the intentional murder charge, which had been the focus of the prosecution (*see People v Benevento*, 91 NY2d 708, 712 [1998]; *People v Baptiste*, 306 AD2d 562, 569-570 [2003]).

We agree with defendant, however, that the evidence in the record is legally insufficient to prove the gross recklessness and additional aggravating circumstances necessary for a conviction of depraved indifference murder. In our view, the jury could not reasonably infer from the evidence a culpable mental state greater than criminal negligence due to the unique combination of events that led to the victim's death, as well as the lack of proof that defendant actually perceived and ignored an obvious and severe risk of serious injury or death.

A verdict is supported by legally sufficient evidence when the proof, viewed in the light most favorable to the prosecution, establishes the elements of the crime beyond a reasonable doubt (*see People v Harper*, 75 NY2d 313, 316 [1990]; *People v Bleakley*, 69 NY2d 490, 495 [1987]; *People v Sullivan*, 300 AD2d 689, 690-691 [2002], *lv denied* 100 NY2d 587 [2003]). Here, County Court instructed the jury as to the elements of intentional murder in the second degree, depraved indifference murder in the second degree, as well as the lesser included offenses of manslaughter in the first degree with intent to cause physical injury (*see* Penal Law § 125.20 [1], [4]), reckless manslaughter in the second degree (*see* Penal Law § 125.15 [1]) and criminally negligent

homicide (*see* Penal Law § 125.10). The jury's finding that defendant was not guilty of intentional murder clearly indicates that it rejected defendant's second statement. That statement contains an explicit admission of an intent to kill the victim and a description of a series of acts reflecting such an intent. Inasmuch as there is no other evidence, and no argument, that these acts were done for any other purpose, we must assume that the jury rejected the acts when it rejected the charge of intentional murder. Thus, we look elsewhere in the record to ascertain whether there is other evidence establishing first, that the circumstances surrounding defendant's conduct evince a depraved indifference to human life, and second, that defendant perceived and disregarded a substantial risk of serious injury or death.

To support defendant's conviction of depraved indifference murder of a child, there must be proof that, "based on an objective assessment of the risk defendant recklessly created and disregarded, the likelihood of causing [serious physical injury or] death from defendant's conduct was so obviously severe that it evinced a depraved indifference to human life" (*People v Sanchez*, 98 NY2d 373, 384 [2002]; *see People v Tinning*, 142 AD2d 402, 407 [1988], *lv denied* 73 NY2d 1022 [1989]). Although the excessive heat in the victim's bedroom ultimately proved fatal and defendant failed to provide relief from the heat by removing the victim from her bedroom or attempting to reduce the heat, the evidence does not establish that her acts and omissions were "committed under circumstances which evidenced a wanton indifference to human life or a depravity of mind" (*People v Register*, 60 NY2d 270, 274 [1983]). "Illustrative of such conduct is driving an automobile on a city sidewalk at an excessive speed and striking a pedestrian without applying the brakes, firing several bullets into a house, beating an infant over a five day period, and placing a bomb in a public place. In each illustration the basic crime was aggravated by additional egregious conduct" (*People v Murphy*, 235 AD2d 933, 936 [1997], *lv denied* 90 NY2d 896 [1997] [citations omitted]). In cases where the victim is a child, there typically are one or more instances of direct harmful contact with the child, as well as other egregious conduct (*see People v Mills*, 1 NY3d 269, 275-276 [2003] [adult struck 12-year-old victim from behind hard enough to cause him to hit his head on a concrete pier and slip off the pier into the water, and then abandoned the submerged victim without summoning help]; *People v Strawbridge*, 299 AD2d 584, 593 [2002] [mother dropped her newborn child into a toilet, placed her in a plastic bag causing death by asphyxiation and disposed of her body in a dumpster]; *People v Mitchell*, 289

AD2d 776, 779 [2001], *lv denied* 98 NY2d 653 [2002] [mother repeatedly struck infant daughter's head against a wall causing skull fractures and did not call for emergency aid until several hours later]; *People v Dexheimer*, 214 AD2d 898, 901 [1995], *lv denied* 86 NY2d 872 [1995] [adult repeatedly struck young child and failed to summon emergency aid]; *People v Bryce*, 174 AD2d 945, 946 [1991], *lv denied* 79 NY2d 854 [1992] [father violently shook infant son and inflicted multiple impacts causing severe head trauma]; *cf. People v Sika*, 138 AD2d 935, 935-936 [1988], *lv denied* 72 NY2d 866 [1988] [mother's failure to provide adequate nourishment and seek medical assistance for infant son was held not to be "so brutal, callous or wanton that it evinced a depraved indifference to human life"]). Here, by contrast, there was neither obviously dangerous conduct by defendant nor harmful physical contact between defendant and the victim.

In addition to the lack of physical contact, there is no evidence that defendant knew the actual temperature in any portion of the apartment or subjectively perceived a degree of heat that would have made her aware that serious injury or death from hyperthermia would almost certainly result. Put another way, the risk of serious physical injury or death was not so obvious under the circumstances that it demonstrated defendant's actual awareness. There was only circumstantial evidence on this point consisting of the subjective perceptions of other persons who later came into the apartment from cooler outside temperatures. Defendant, who had been in the apartment as the heat gradually intensified over many hours, and who was described by others as appearing flushed and acting dazed, could not reasonably be presumed to have had the same perception of oppressive and dangerous heat. Rather, defendant testified that she knew only that the heat made her feel dizzy and uncomfortable, and denied any awareness of a risk of death. Most significantly, there is no dispute that defendant remained in a room that was nearly as hot as the victim's bedroom for approximately nine hours and checked on the victim several times before the foster parents returned. This evidence of defendant's failure to perceive the risk of serious injury stands unrefuted by the prosecution.

Defendant's ability to appreciate such a risk was further brought into doubt by the prosecution's own expert witness, who described her as having borderline intellectual function, learning disabilities and a full-scale IQ of only 73. We also note that here, unlike where an unclothed child is shut outside in freezing temperatures, the circumstances are not of a type from which it can be inferred without a doubt that a person of even

ordinary intelligence and experience would have perceived a severe risk of serious injury or death.

For these reasons, we find that defendant's conduct was not proven to have been "so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another" (*People v Fenner*, 61 NY2d 971, 973 [1984]; *see People v Asaro*, 182 AD2d 823, 824 [1992]; *People v Thacker*, 166 AD2d 102, 108 [1991], *lv denied* 79 NY2d 865 [1992]; *People v Sika, supra* at 935-936; *People v Osburn*, 124 AD2d 1048, 1049 [1986], *lvs denied* 69 NY2d 748, 831 [1987]; *cf. People v Fink*, 251 AD2d 751, 752 [1998], *lv denied* 92 NY2d 924 [1998]). Accordingly, no valid line of reasoning and permissible inferences could have led the jury to the conclusion that it reached (*see People v Johnson*, 250 AD2d 1026, 1027 [1998], *lv denied* 92 NY2d 899 [1998]; *People v Sika, supra* at 935-936).

We turn next to the issue of whether the record evidence establishes, beyond a reasonable doubt, one or more lesser included offenses. As to manslaughter in the first degree, there is no proof, other than defendant's discredited second statement, that she intentionally caused "serious physical injury" (Penal Law § 125.20 [1]) or "physical injury" (Penal Law § 125.20 [4]). As to the lesser included offenses of manslaughter in the second degree and criminally negligent homicide, we must compare the requisite culpable mental states. A person is guilty of manslaughter in the second degree when he or she recklessly causes the death of another person (*see* Penal Law § 125.15 [1]) and of criminally negligent homicide when, with criminal negligence, he or she causes the death of another person (*see* Penal Law § 125.10). Reckless criminal conduct occurs when the actor is aware of and consciously disregards a substantial and unjustifiable risk, and criminal negligence is the failure to perceive such a risk (*see* Penal Law § 15.05 [3], [4]).

As we have noted, there is no support for a finding that defendant perceived and consciously disregarded the risk of death which was created by the combination of the "runaway" furnace and her failure to release the victim from her bedroom (*see* Penal Law § 15.05 [3]; § 125.15 [1]). None of defendant's proven conduct reflects such an awareness and the fact that she subjected herself to the excessive heat is plainly inconsistent with a finding that she perceived a risk of death.

However, the evidence was sufficient to establish defendant's guilt beyond a reasonable doubt of criminally negligent homicide. A jury could reasonably conclude from the evidence that

defendant *should* have perceived a substantial and unjustifiable risk that the excessive heat, in combination with her inaction, would be likely to lead to the victim's death (*see People v Manon*, 226 AD2d 774, 776 [1996], *lv denied* 88 NY2d 1022 [1996]). Since defendant was the victim's caretaker, this risk was of such a nature that her failure to perceive it constituted a gross deviation from the standard of care that a reasonable person in the same circumstances would observe in such a situation (*see* Penal Law § 15.05 [4]; § 125.10). Thus, defendant's conduct was shown to constitute criminal negligence and such a finding would not be against the weight of the evidence (*see People v Rollins*, 118 AD2d 949, 951 [1986]; *cf. People v Boutin*, 75 NY2d 692, 696-697 [1990]). Accordingly, we reduce the conviction from depraved indifference murder to criminally negligent homicide and remit the matter to County Court for sentencing on the reduced charge (*see* CPL 470.15 [2] [a]; 470.20 [4]).

Cardona, P.J., Crew III, Mugglin and Kane, JJ., concur. Ordered that the judgment is modified, on the law, by reducing defendant's conviction for murder in the second degree to criminally negligent homicide; vacate the sentence imposed on said conviction and matter remitted to the County Court of Tioga County for sentencing; and, as so modified, affirmed.