People v Guzy (2018 NY Slip Op 08714)





People v Guzy


2018 NY Slip Op 08714


Decided on December 20, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: December 20, 2018

108894

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
JOHN M. GUZY, Appellant.

Calendar Date: November 13, 2018

Before: McCarthy, J.P., Lynch, Clark, Mulvey and Rumsey, JJ.


John R. Trice, Elmira, for appellant, and appellant
pro se.
Joseph A. McBride, District Attorney, Norwich (Hannah E.C. Moore, New York Prosecutors Training Institute, Inc., Albany, of counsel), for respondent.



MEMORANDUM AND ORDER
Mulvey, J.
Appeal from a judgment of the County Court of Chenango County (Revoir Jr., J.), rendered June 27, 2016, convicting defendant following a nonjury trial of the crimes of murder in the second degree, attempted murder in the second degree, assault in the first degree (two counts), criminal possession of a weapon in the second degree (two counts), criminal possession of a weapon in the third degree, tampering with physical evidence, driving while intoxicated and criminal possession of a weapon in the fourth degree (six counts).
On the afternoon of October 27, 2014, defendant, a retired police officer carrying an unlicensed semiautomatic handgun, was driving his vehicle while under the influence of alcohol on a state highway in Chenango County. Defendant closely approached and eventually passed an SUV that was being operated below the posted speed limit by Derek D. Prindle (hereinafter the son), whose father, Derek S. Prindle, was in the front passenger seat. While the accounts differed as to what transpired, it was undisputed that, after defendant passed the Prindle SUV, both vehicles pulled into a parking lot and words were exchanged. During the encounter, defendant shot the father in the stomach, injuring him, and also shot the son in the chest and abdomen, causing him to bleed to death. The father and son were unarmed and no weapons were found at the scene. After the shooting, defendant left the scene and drove to a nearby State Police barracks and reported the shooting, tossing the gun out of the window of his vehicle en route, where it was later recovered. A search of defendant's home turned up unlicensed handguns, including an assault rifle, three revolvers, three semiautomatic handguns and ammunition. As relevant here, defendant was thereafter charged by indictment with murder in the second degree, attempted murder in the second degree, assault in the first degree (two counts), criminal possession of a weapon in the second degree (two counts), criminal possession of a weapon in the third degree, tampering with physical evidence, driving while intoxicated and criminal possession of a weapon in the fourth degree (six counts). Following a bench trial, defendant was [*2]convicted of the foregoing charges [FN1] and sentenced to consecutive prison terms of 25 years to life for the murder conviction and 15 years for the attempted murder conviction, along with lesser concurrent prison sentences for the remaining convictions. Defendant appeals.
We affirm. Defendant argues that his convictions are against the weight of the evidence, including the rejection of his justification defense, which he contends the People failed to disprove. "[A] weight of the evidence analysis requires us to first determine, based on all of the credible evidence, whether a different result would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine if the verdict is supported by the weight of the evidence" (People v Wilson, 164 AD3d 1012, 1014 [2018]; see People v Sanchez, 32 NY3d 1021, 1023 [2018]; People v Danielson, 9 NY3d 342, 348 [2007]).
At trial, the father, a 61-year-old retiree, testified that his son, age 26, was driving an SUV on the two-lane state highway about 51 miles per hour in a 55-mile-per-hour speed zone. A car driven by defendant approached the SUV from the rear, followed very closely behind and then pulled beside the SUV for a moment and then pulled in front of the SUV. Defendant then slammed on his brakes and, after a pause of a few seconds, he again slammed on his brakes, blocking both lanes. The father motioned for defendant to pull into an adjacent parking lot to see who was driving and what was going on. Defendant pulled into the parking lot, followed by the son and the father in the SUV, and then defendant, who appeared to be "very [a]ngry" and "very irate," exited his vehicle and approached the SUV, yelling, "Have you got a f****** problem?" When defendant was about six inches from the passenger side of the SUV, defendant said, "I'll kill you both . . . [b]ecause you're a f****** a**hole." Defendant then spit in the father's face and, when the father stepped out of the SUV, defendant shot him in the chest. The son exited the vehicle to help his father and tried to restrain defendant by pinning him to the SUV, and the father tried to grab defendant's arm and kicked him in the groin. At that point, defendant shot the son twice, once in the chest and once in the abdomen, and then fled. There were no eyewitnesses to the shooting. A few witnesses testified to seeing wrestling or grappling among two or three men from a distance. An attorney driving by testified that he saw two older men appear to grab one another and then saw two men (presumably the father and the son) grab the "lone guy" (presumably defendant). Several other witnesses testified to what the father stated immediately after the shooting, including that the incident began with road rage, that defendant said he would kill them before shooting them and that defendant hit the father in the head with the gun and spat in his face. Some of the accounts contained inconsistencies with regard to, among other details, who pulled into the parking lot first and which person defendant shot first.
Defendant, a 57-year-old correction officer and retired police officer, offered a different account of the incident. He recounted that the father continually gave him the middle finger as defendant passed the SUV, so defendant pulled into the parking lot to "get away" from the SUV. According to defendant, the SUV followed him into the parking lot, where the son and the father exited the SUV and, after the father said, "Let's kick his ass," the pair approached defendant and began punching him in the face and head. Defendant fought back and spit in the father's face when the father kicked him. Defendant hit the son in the head with his gun a few times and told them to "[g]et the f*** away" and, after the father said, "Get the gun," defendant shot the son twice, fearing that he would get his gun. When the father tried to grab the gun, defendant shot him.
Although a different verdict would not have been unreasonable, viewing the trial evidence in a neutral light, we do not find that County Court, the trier of fact, failed to give the evidence the weight that it should be accorded (see People v Bleakley, 69 NY2d 490, 495 [1987]; People v Rice, 162 AD3d 1244, 1246 [2018], lv denied 32 NY3d 940 [2018]). We defer to the underlying credibility assessments of the trier of fact, which had the opportunity to view the [*3]witnesses and hear their conflicting testimony, and find that the verdict is supported by the weight of the credible evidence (see id.). To that end, the father, which the trier of fact credited, testified that defendant was driving aggressively and, after the son pulled into the parking lot, it was defendant who exited his vehicle and approached the SUV, cursing and angry that the son had been driving slowly; defendant never identified himself as a retired police officer or indicated that he was carrying a weapon. It is also significant that defendant threatened to kill the father and the son before spitting in the father's face and then punched and shot the father after he exited the SUV, causing him severe injuries. When the son came to his stricken father's aid and tried to help him restrain defendant, defendant twice shot the son at close range.
The evidence, including defendant's conduct, threats to kill the father and the son and the surrounding circumstances, convincingly established that, acting with the requisite intent, defendant attempted to kill the father and killed the son, and he caused serious physical injury to both by means of a deadly weapon, committing the charged crimes of attempted murder of the father, intentional second degree murder of the son and assault in the first degree as to both victims (see People v Every, 146 AD3d 1157, 1162 [2017], affd 29 NY3d 1103 [2017]). Defendant's testimony to the contrary was rationally rejected as not credible, and his claim that he pulled into the parking lot to "get away from" the father and the son was not believable given that he was armed and driving in front of the SUV and could have driven away from the slow-moving SUV. Further, defendant admitted engaging in a fight with the son and the father and pulling his gun out, even though they were concededly not armed with any weapons. Defendant did not call the police after the shooting but instead fled, attempting to conceal the murder weapon. Defendant's account that the son and the father repeatedly punched him in the face and head was belied by the testimony of the state trooper who saw defendant after he turned himself in. The trooper recounted that once the blood was washed from defendant's face, he had no significant injuries and had only a "little" injury on his head and an injury to his right hand consistent with discharging a semiautomatic handgun.
Defendant's argument that it was not reasonable for the factfinder to conclude that defendant initiated the encounter given that the son and the father were considerably taller and bigger than defendant is unconvincing. First, defendant, a highly-trained police veteran, knew he was carrying a semiautomatic weapon. Second, defendant did not learn the larger statures of the father and the son until after he approached the SUV, threatened them and the father exited the SUV; likewise, it was not until after shooting the father that the son exited the SUV and defendant first observed the son's larger stature [FN2]. Moreover, while witnesses offered varying interpretations of the confrontation and some suggested that, immediately after the shooting, the father made statements that contained some inconsistencies, none of them witnessed the shooting or had a good view of the events that led up to it. Several witness accounts were consistent with the father's testimony, including that defendant had threatened to kill him and his son before he shot them. We are not persuaded by defendant's argument that the other witnesses' testimony undermined the father's credibility or his account of the incident.
We further find that the credible evidence fully supports County Court's finding that the People disproved the justification defense beyond a reasonable doubt. The testimony established that defendant did not reasonably believe that either the father or the son was using or about to use deadly physical force against him so as to justify his use of such force, and that a reasonable person in defendant's position would not have perceived that deadly force was necessary (see Penal Law § 35.15 [1], [2] [a]; People v Petty, 7 NY3d 277, 284-285 [2006]; People v Jones, 3 NY3d 491, 496 [2004]; People v Every, 146 AD3d at 1161-1162). It was undisputed that the father and the son were unarmed and that defendant had no reason to believe that they had any weapons. Further, defendant provoked and escalated the encounter and was the initial aggressor and, indeed, he admitted at trial that he could have retreated before the shooting. As such, [*4]defendant was not entitled to thereafter use deadly physical force in these circumstances (see Penal Law § 35.15 [1] [a], [b]; People v Petty, 7 NY3d at 285; People v Gibson, 141 AD3d 1009, 1011-1012 [2016]). In view of the foregoing, we do not find that the factfinder's resolution of the conflicting testimony and concomitant rejection of the justification defense were against the weight of the evidence (see People v Every, 146 AD3d at 1162; People v Gibson, 141 AD3d at 1012).
Next, defendant contends that all of the criminal possession of a weapon convictions should be dismissed because, as a correction officer and retired police officer, he is entitled to an exemption from prosecution under Penal Law § 265.20 (a) (1) (c) and (f) and under federal law (see 18 USC § 926B [The Law Enforcement Safety Act]). Although defendant moved to dismiss some of the weapon possession counts at trial,[FN3] he did so on entirely different grounds and never raised these statutory defenses at trial so as to put the People to their burden of disproving them beyond a reasonable doubt (see Penal Law § 25.00 [1]; see also William C. Donnino, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law § 265.20 at 412). Accordingly, defendant's present claims, raised for the first time on appeal, are unpreserved (see CPL 470.05 [2]; People v Oshintayo, 163 AD3d 1353, 1357 [2018], lv denied 32 NY3d 1006 [2018]).
Defendant also claims that his physician-client privilege was violated. Initially, although defendant's medical records were privileged, he put his medical condition in issue by claiming that he had been assaulted by the father and the son, thereby waiving this privilege (see CPLR 4504 [a]; Dillenbeck v Hess, 73 NY2d 278, 280, 283 [1989]; People v Centerbar, 80 AD3d 1008, 1009 [2011]; cf. People v Strawbridge, 299 AD2d 584, 589-591 [2002], lvs denied 99 NY2d 632 [2003], 100 NY2d 599 [2003]). Further, defendant's disclosure of his medical condition to the state trooper to whom he reported the incident waived the privilege to the extent of that disclosure and the trooper was permitted to testify to her observations of defendant at that time (see People v Strawbridge, 299 AD2d at 590-591). More to the point, however, defendant's medical records were not introduced at trial and no medical witness testified to the treatment of defendant after the incident or to any statements made by him while receiving treatment. Thus, any error in the hospital delivering defendant's medical records to the People rather than to County Court, as directed by the judicial subpoena, and any defect in defendant's consent to the release of his medical records was not prejudicial and was harmless (see id. at 592; People v Carkner, 213 AD2d 735, 738 [1995], lvs denied 85 NY2d 970 [1995], 86 NY2d 733 [1995]; see also People v Greene, 9 NY3d 277, 280-281 [2007]).
Defendant further argues that his signed consent to withdraw blood was not voluntary. Notably, the People also obtained a search warrant from County Court to withdraw defendant's blood. The blood test — conducted pursuant to defendant's consent and the search warrant — reflected that defendant's blood alcohol level was .11%. In moving to suppress the blood test results, defendant only challenged the search warrant and never argued that his consent was involuntary [FN4]. Moreover, at the suppression hearing and again at trial, defendant failed to raise any objections to the testimony of the state trooper that he had consented to the blood test or to [*5]the voluntariness of the signed consent form [FN5]. As defendant never raised this issue before County Court, a record was not made regarding the circumstances surrounding the consent, and the People were never put to their burden of proving, from the totality of the circumstances, that the consent was voluntary, and the record reflects no evidence from which a finding of involuntariness could be based (see People v Centerbar, 80 AD3d at 1010-1011; People v Skardinski, 24 AD3d 1207, 1208 [2005]; People v Dobson, 285 AD2d 737, 738 [2001], lvs denied 97 NY2d 655, 658 [2001]). Accordingly, the challenge to defendant's consent to the blood draw has not been preserved for our review (see CPL 470.05 [2]; cf. People v Marietta, 61 AD3d 997, 998 [2009]; People v Skardinski, 24 AD3d at 1208). Given that the People were entitled to rely on defendant's unchallenged signed consent to the blood draw, his challenge to the search warrant need not be addressed, and the conviction for driving while intoxicated will not be disturbed.
Finally, we find defendant's challenge to his sentence to be meritless. Consecutive sentences were authorized for defendant's separate and distinct acts of shooting the son and the father, although they were both part of a single road-rage confrontation (see Penal Law § 70.25 [2]; People v McKnight, 16 NY3d 43, 47-49 [2010]; People v Grady, 40 AD3d 1368, 1375 [2007], lv denied 9 NY3d 923 [2007]). To that end, "the test is not whether the criminal intent is one and the same and inspire[ed] the whole transaction, but whether separate acts have been committed with the requisite criminal intent" (People v McKnight, 16 NY3d at 49 [internal quotation marks, brackets and citations omitted]; accord People v Brahney, 29 NY3d 10, 29 [2017]). Contrary to defendant's contentions, People v Rosas (8 NY3d 493 [2007]), involving a double shooting and two murder in the first degree convictions for which concurrent sentences were required, does not compel concurrent sentences here. In Rosas, "the same acts constitute[d] both crimes" in that the charged first degree murder statute (see Penal Law § 125.27 [1] [a] [viii]) required that the defendant intentionally murdered one person and, as an aggravating factor, caused the death of another person, with the intent to cause death or serious physical injury to the second person (id. at 498). Here, by contrast, given defendant's distinct intentional act of shooting the father in an attempt to cause his death and his separate acts of twice shooting the son, intending to and causing his death, the same act did not constitute both crimes and consecutive sentences were authorized (see Penal Law § 70.25 [2]; People v McKnight, 16 NY3d at 47-49; People v Grady, 40 AD3d at 1375).
We are further unpersuaded by defendant's argument that the sentence is harsh and excessive based upon his lack of a criminal record, law enforcement history and health problems. County Court considered all of the relevant mitigating factors but found, based upon defendant's senseless and unprovoked actions here, that he was "a threat and menace to the community" deserving of a lengthy sentence for the tragic murder of the son and attempted murder of the father. Upon review of all of the circumstances, including the devastation caused to the Prindle family, defendant's failure to accept responsibility for his violent actions and the gravity of the danger to the public caused by such an act of road rage, we find no extraordinary circumstances or abuse of discretion warranting a reduction of the sentence in the interest of justice (see People v Parbhudial, 135 AD3d 978, 982 [2016], lv denied 27 NY3d 967 [2016]). Defendant's remaining claims have been considered and determined to be without merit.
McCarthy, J.P., Lynch, Clark and Rumsey, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: The indicted charges of criminal use of a firearm in the first degree (two counts) were dismissed at the close of proof.

Footnote 2: The testimony established that, at the time of the incident, defendant was approximately 5 feet 7 inches tall and weighed roughly 240 pounds, the son was 6 feet 5 inches tall and weighed about 220 pounds and the father was 6 feet tall and weighed about 160 pounds.

Footnote 3: At trial, defendant's motion to dismiss count 9 and counts 12 through 17 was denied. That motion was premised on the argument that the evidence was legally insufficient to establish that defendant had possessed the guns that were seized from his home days after the shooting, as he had been in custody since shortly after the shooting.

Footnote 4: Defendant's motion to suppress the lab results was premised upon a challenge to the search warrant, not to the voluntariness of his consent to the blood draw. At defendant's request, that motion was decided by County Court on the parties' submissions, including the transcribed hearing of the oral application for the search warrant. As a result, the suppression hearing testimony did not address the issuance of the search warrant. County Court denied the motion to suppress the search warrant, finding that there was probable cause to support its issuance. We need not address defendant's challenge to that warrant given defendant's consent to the blood draw.

Footnote 5: Defendant's consent to the blood test renders the time limits in Vehicle and Traffic Law § 1194 (2) (a) (1) inapplicable (see People v Atkins, 85 NY2d 1007, 1009 [1995]; People v Marietta, 61 AD3d 997, 998 [2009]).