*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:   December 3, 2015                      106219
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                        Respondent,
        v                                    MEMORANDUM AND ORDER

ANTHONY C. HARDEN,
                        Appellant.
_____

Calendar Date:   October 15, 2015

Before:  Garry, J.P., Egan Jr., Rose and Clark, JJ.

_____

        Carolyn B. George, Albany, for appellant, and appellant pro
se.

        P. David Soares, District Attorney, Albany (Vincent Stark
of counsel), for respondent.

_____

Garry, J.P.

        Appeal from a judgment of the Supreme Court (Breslin, J.),
rendered July 23, 2013 in Albany County, upon a verdict
convicting defendant of the crime of assault in the second
degree (two counts).

        Defendant was previously convicted of several crimes
arising out of an altercation in the City of Albany in which
three men (hereinafter victim 1, victim 2 and victim 3) received
knife wounds.  Upon defendant's prior appeal, this Court reversed
the convictions and remitted the matter for a new trial (99 AD3d
1031, 1034 [2012], lv denied 20 NY3d 986 [2012]).  Following the
second trial, the jury acquitted defendant of all charges
involving victim 1 and convicted him of one count each of assault

in the second degree as to victim 2 and victim 3. He was sentenced as a second felony offender to consecutive prison terms of seven years followed by five years of postrelease supervision on the conviction as to victim 2, and five years followed by five years of postrelease supervision on the conviction as to victim 3. Defendant appeals.

Defendant contends that the evidence was legally insufficient to establish either that he intended to cause physical injury or that he was the aggressor rather than trying to escape from the confrontation. He further asserts that the jury's rejection of his justification defense was against the weight of the evidence. Defendant's legal sufficiency arguments are unpreserved as they were not specifically addressed in his general trial motion for dismissal (see People v Parker, 127 AD3d 1425, 1426 [2015]). Nevertheless, "our weight of the evidence analysis necessarily involves an evaluation of whether all elements of the charged crimes were proven beyond a reasonable doubt at trial" (People v Pine, 126 AD3d 1112, 1114 [2015] [internal quotation marks, brackets and citations omitted]).

The People's witnesses included the three victims, their four friends — victim 1's wife, another woman and two men — with whom the victims had been walking home from a street festival, and several onlookers. Taken as a whole, their testimony revealed that the incident began with an angry verbal exchange between defendant's girlfriend, who was driving a vehicle in which defendant was riding, and victim 1 and his wife, who testified that they had fallen behind the rest of their group and that the vehicle nearly struck them as they were crossing the street. Following this initial incident, victim 1 and his wife continued walking up the street. Meanwhile, the vehicle pulled over and defendant got out, pulled off his sweatshirt, threw it into the vehicle and followed them. One of the bystanders described defendant as so "agitated" that the bystander "had a bad feeling" and recorded the vehicle's license plate number; another bystander testified that defendant followed victim 1 and his wife for about 1,000 yards.

Upon catching up with victim 1 and his wife, defendant began to castigate them, and the rest of the group joined the

increasingly heated discussion.  There was testimony that some of the participants allegedly tried to defuse the confrontation, advising defendant that they did not want to fight and asking him to leave them alone, but defendant was "very aggressive," "was looking for a fight," and said "I want it now."  Meanwhile, defendant's girlfriend drove her vehicle the wrong way on a one-way street to join them, got out and entered the confrontation, which then quickly erupted into two separate physical fights, one involving the women and the other the men.  The People's witnesses said that the violence began when defendant's girlfriend struck victim 1's wife, that defendant then struck or shoved the other woman in the group as she tried to help victim 1's wife, and that when victim 1 tried to help his wife, defendant struck him, breaking his nose.  Defendant allegedly kept punching victim 1 while the others tried unsuccessfully to pull him off; then defendant and the three victims — and according to some witnesses, the other two men — began exchanging punches.  One of the other two men testified that he hung back, watching the fight, and after 15 or 20 seconds saw defendant reach into his waistband, withdraw a knife and stab victim 1, who fell to the ground.  When victim 2 "lean[ed] in" to help victim 1, defendant stabbed him in the neck.  Victim 3 testified that defendant, who was very close to him, then motioned at him and said, "I live for this s***."  Victim 3 backed away and did not realize until a few moments later that he had been stabbed in the hand and the torso.  Several other witnesses stated that they heard defendant utter this phrase; these witnesses included an EMT who had happened upon the scene, who also testified that he saw defendant swinging a knife against three men and that his demeanor was very aggressive.

Defendant's girlfriend retreated to her vehicle, followed by defendant; several witnesses saw a knife in his hand as he ran and, when he neared the vehicle, saw him lunge toward a man who was taking a picture of its license plate.  As this man backed away, he took a blurry photograph, later admitted at trial, of defendant running toward him with what appeared to be a knife.  Defendant and his girlfriend then fled in the vehicle; police arrested defendant at his home later that night.

Defendant and his witnesses offered a different account. Defendant said that he became upset when someone threw dirt into the vehicle during the initial confrontation, which might have struck his young child in the backseat; he stated that he was trying to discuss the incident with victim 1 when the other four men surrounded him, saying, "I'm game" and "let's party." Defendant's girlfriend said that all five men were surrounding defendant when she joined the altercation, and that she heard one of the men tell defendant that he was "game" just before the fight among the women began, which she claimed was initiated by victim 1's wife. When that altercation ended, she saw defendant backed up against a car fighting with all five men.

Defendant denied that he initiated the fight among the men, testifying that he did not hit anyone until after someone struck him in the back of the head as he tried to help his girlfriend. He said he then backed up, trying to escape as all five men threw punches at him, and fell to the ground, where the men kneed and kicked him. When he managed to get up, the men pinned him first to one parked car and then to a second car, where one of the men pulled out a knife. Defendant said that he snatched the knife away by its handle, using his left hand, and then started stabbing, testifying that if he had not done so, he would have been killed. When the men backed off, he dropped the knife and fled to his vehicle, explaining that the object visible in his hand in the blurry photograph taken at the scene was not a knife, but his girlfriend's flip flops, which he had allegedly retrieved after she lost them.[1] He further stated that two of the victims — who, according to other witnesses, were incapacitated by their wounds by this time — chased him to the vehicle. A witness who saw the confrontation from a nearby car supported defendant's story in part, testifying that he saw five men fighting with one man who was backed up against a car, and that they were "beating him up pretty bad." Defendant suffered injuries to his face during the struggle, but — despite his claim that he grabbed the knife from one of the other men — had no lacerations on his hands

---

[1] The knife was never located, although police testified that they exhaustively searched the area where the fight occurred.

other than a partially healed, scabbed-over cut on his left thumb. He acknowledged that he did not mention this cut to the medical professionals who treated his other injuries.

Based upon the testimony of defendant's witnesses, a different outcome would not have been unreasonable. Nevertheless, upon our review, we find no reason to disturb the jury verdict rejecting defendant's justification defense, which applies when conduct that would otherwise have been criminal "is necessary as an emergency measure to avoid an imminent . . . injury which is about to occur by reason of a situation occasioned or developed through no fault of the actor," and the threatened injury is so grave as to outweigh the harm resulting from the actor's conduct (Penal Law § 35.05 [2]). The conflicts in the testimony as to whether defendant was the aggressor or was trying to escape, and as to whether he was the first to escalate the confrontation by wielding the knife or took it from one of the other men to defend himself, were for the jury to resolve (see People v Vanderhorst, 117 AD3d 1197, 1199-2000 [2014], lv denied 24 NY3d 1089 [2014]).

Defendant's intent to cause injury was a factual question that the jury could infer from his conduct and the surrounding circumstances (see People v Francis, 83 AD3d 1119, 1122 [2011], lv denied 17 NY3d 806 [2011]; People v Gonzalez, 64 AD3d 1038, 1041 [2009], lv denied 13 NY3d 796 [2009]). Here, one of the witnesses who saw defendant using the knife testified that he was not just waving it, but was "jabbing" it with a rapid outward movement of his arm, which the witness described as a "jack motion with full intent to strike." As to defendant's claim that the wounds he inflicted were not sufficiently severe as to indicate that he intended to cause injury, witnesses said that after victim 2 was stabbed in the neck, he was coughing and "choking on his own blood" and that his head "[blew] up like a balloon" to twice its normal size. He was intubated, required emergency surgery and was hospitalized for a week, including two days in intensive care. The thoracic surgeon who treated him testified that the laceration in his clavicle had "completely violated" the front wall of his trachea, or airway, and also caused an abrasion on the trachea's back wall, and that these injuries posed a substantial risk of death. Victim 3 was stabbed

in the abdomen and the hand and required surgery to repair a severed extensor tendon.  His surgeon testified that he would have lost the ability to use his index finger if the tendon had not been repaired.  Victim 3 testified that he spent two months in physical therapy, had to relearn the ability to write and, several years later, still suffered occasional pain and other residual effects.  Defendant's intent to cause injury may readily be inferred from the severity of these wounds (see People v Newland, 83 AD3d 1202, 1204 [2011], lv denied 17 NY3d 798 [2011]).  Given this evidence, as well as the testimony that defendant initiated the confrontation by pursuing the victims and then escalated it by pulling out the knife, the jury's rejection of the justification defense was not contrary to the weight of the evidence (see People v Green, 121 AD3d 1294, 1295 [2014], lv denied 25 NY3d 1164 [2015]; People v Fisher, 89 AD3d 1135, 1137-1138 [2011], lv denied 18 NY3d 883 [2012]; People v Terk, 24 AD3d 1038, 1039-1040 [2005]).

Defendant next contends that Supreme Court's jury instruction on justification was erroneous.  However, defendant's counsel expressly agreed to the instruction during the charge conference and, thereafter, neither objected when the charge was given nor when the jury asked to have it reread during deliberations.  Counsel objected to the instruction for the first time only after the court received a note from the jury indicating that it had reached a unanimous verdict.  As this objection came too late to permit any error to be corrected, the claim is unpreserved (see CPL 470.05 [2]; People v Houck, 101 AD3d 1239, 1240 [2012]).  We further reject defendant's claim that his counsel's failure to object to the instruction constituted ineffective assistance, which "does not arise from counsel's failure to make a motion or argument that has little or no chance of success" (People v Clarke, 110 AD3d 1341, 1345 [2013], lv denied 22 NY3d 1197 [2014] [internal quotation marks and citations omitted]).  A timely objection to the instruction would not have succeeded, as our review reveals no error.  Contrary to defendant's claim, the court did not err in instructing the jury to assess defendant's subjective belief that deadly physical force was necessary to defend himself with reference to each individual victim, rather than with reference

to all of the circumstances.[2]  Penal Law § 35.15 (2) imposes a two-part standard by which the jury must first determine whether a defendant subjectively believed that the use of deadly physical force against an individual was necessary because that individual was using or about to use deadly force, and then must determine whether this belief was objectively reasonable in view of all the circumstances (see Matter of Y.K., 87 NY2d 430, 433-434 [1996]). The court's instruction mirrored these requirements and, using the language of the pattern charge, properly instructed the jury to consider the subjective element of the defense with regard to each victim and to consider the surrounding circumstances with regard to the second, objective prong of the test (see People v Young, 33 AD3d 1120, 1122-1123 [2006], lv denied 8 NY3d 921 [2007]; CJI2d[NY] Justification: Use of Deadly Physical Force in Defense of a Person).

Defendant next contends that Supreme Court erred in failing to poll the jury on the counts as to which he was acquitted. This contention is unpreserved; a jury must be polled upon either party's request, but a defendant cannot challenge the manner in which the poll was taken on appeal if he or she failed to call the trial court's attention to the alleged deficiency (see CPL 310.80; People v Mercado, 91 NY2d 960, 963 [1998]; People v Henry, 64 AD3d 804, 806 [2009], lv denied 13 NY3d 860 [2009]; People v Booker, 53 AD3d 697, 704 [2008], lvs denied 11 NY3d 853, 856 [2008]).  Here, defendant asked the court to poll the jury, agreed that it would be sufficient to do so only as to the guilty verdicts, and at no time objected to that procedure.

Finally, defendant's sentence was not harsh or excessive. The aggregate of the two consecutive terms was shorter than the maximum that defendant could have received as a second felony offender (see Penal Law §§ 70.06 [3] [d]; 70.25).  In view of defendant's lack of remorse, his criminal history, and the severity of the victims' injuries, we find no abuse of discretion

---

[2]  The use of a knife constitutes deadly physical force as a matter of law (see People v Taylor, 118 AD3d 1044, 1048 [2014], lv denied 23 NY3d 1043 [2014]; People v Jones, 24 AD3d 815, 816 [2005], lv denied 6 NY3d 777 [2006]).

or extraordinary circumstances warranting modification (see People v Hill, 130 AD3d 1305, 1306 [2015]; People v Ferrer, 115 AD3d 1113, 1114 [2014]; People v Baugh, 101 AD3d 1359, 1362-1363 [2012], lv denied 21 NY3d 911 [2013]).

Egan Jr., Rose and Clark, JJ., concur.

ORDERED that the judgment is affirmed.

ENTER:

Robert D. Mayberger
Clerk of the Court