Supreme Court, Appellate Division
Third Judicial Department

Decided and Entered: January 19, 2017 107581
_____

THE PEOPLE OF THE STATE OF
    NEW YORK,
                        Respondent,

        v                                          MEMORANDUM AND ORDER

DOUGLAS R. EVERY,
                        Appellant.
_____

Calendar Date: November 14, 2016

Before: McCarthy, J.P., Garry, Rose, Mulvey and Aarons, JJ.

_____

        William T. Easton, Rochester, for appellant.

        Kirk O. Martin, District Attorney, Owego, for respondent.

_____

Garry, J.

        Appeal from a judgment of the County Court of Tioga County
(Keene, J.), rendered January 30, 2015, upon a verdict convicting
defendant of the crime of manslaughter in the first degree.

        In October 2013, defendant caused the victim's death by
stabbing him in the chest with a knife. The stabbing occurred
in a home located in the Town of Tioga, Tioga County, owned by
defendant and shared by defendant, the victim, and a third man
named James Atwell. Defendant was charged with murder in the
second degree and tampering with physical evidence. The jury
acquitted defendant of the charged crimes, but convicted him of
manslaughter in the first degree as a lesser included offense of
murder in the second degree. County Court denied defendant's CPL
330.30 motion to set aside the verdict and sentenced him to 17
years in prison, to be followed by five years of postrelease

supervision.  Defendant appeals.

The fact that defendant stabbed the victim was uncontroverted.  Immediately after the stabbing, defendant told three people — the victim's mother, a 911 dispatcher and the first law enforcement officer to arrive at the scene — that he had stabbed the victim.  The officer saw the victim's body on the kitchen floor.  There was blood on a kitchen counter and two knives near the sink; the victim's DNA was later found on the counter and on one of the knives.  At trial, defendant raised the defense of justification and further contended that the victim had lunged toward him and impaled himself on the knife.  Upon appeal, defendant contends that his conviction was against the weight of the evidence as the People failed to prove beyond a reasonable doubt that he was not justified in using deadly force or that he intended to cause serious physical injury.

The People presented the eyewitness testimony of Atwell, who was in his 80s and confined to a wheelchair.  Atwell testified that he and the victim, who was Atwell's caretaker, had resided as tenants in defendant's home for several months before the stabbing occurred.  On that day, defendant returned home from work at about 5:00 p.m. and began drinking alcohol.  The victim, who had spent the day working in the garage, came into the house between 7:00 p.m. and 8:00 p.m. and began preparing dinner. Atwell stated that he did not believe that the victim had been drinking alcohol; however, testing later revealed that the victim's blood alcohol content was .27.  Almost immediately after the victim entered the house, defendant and the victim began a verbal disagreement, moving from room to room as they argued, and eventually beginning to push and hit each other.  Atwell claimed that defendant initiated both the verbal and physical altercations and that he never saw the victim throw defendant around or push him to the floor.

Shortly before 8:00 p.m., defendant left the house, at which point the lights and electricity went off; Atwell stated that he believed that defendant turned off the power.  Five or 10 minutes later, defendant came back in, the power was turned on and the argument resumed.  Atwell testified that he saw the victim walk from the laundry room into the adjoining kitchen,

with defendant following him.  In the kitchen, defendant grabbed a knife from the sink area and stabbed the victim in the chest. The victim immediately fell to the floor and did not respond when defendant asked him to get up.  Atwell stated that the victim did not lunge toward defendant before the stabbing, that his arms were by his sides and that he had no weapon or other objects in his hands.  Defendant called 911 and the victim's mother and then went outside to wait for emergency personnel.

In an interview with investigators later that night, defendant offered an account that differed sharply from that of Atwell.  The investigators testified at trial, and a video recording of the interview was admitted into evidence.  Defendant claimed that the victim had initiated the altercation, initially by arguing verbally with defendant about various subjects. According to defendant, the victim then "went off," threw defendant around several rooms, onto the floor and against furniture, and tipped over chairs.  Defendant left the residence to summon assistance and made several attempts to call 911, but none of the calls went through because the electricity had been turned off – by the victim, according to defendant – which prevented defendant's cell phone signal booster from operating. Subsequent inspection of defendant's cell phone revealed that several incomplete calls were commenced during the pertinent time period; the first three digits of the main line for 911 dispatch were dialed three times, and one attempted call was made to a friend of defendant.[1]

Defendant told the officers that he was not fearful of the victim when he went back into the residence, and he did not claim that the victim had a weapon or threatened to use one.  He said that the victim continued to yell at him and then "came at him," at which point defendant picked up the knife from a kitchen counter to defend himself.  He said that he backed away into the adjoining laundry room, holding the knife and telling the victim to leave him alone; the victim followed him, allegedly saying "go

---

[1]  The testimony established that the main line for 911 dispatch is 687-1010; the phone revealed that "687" had been dialed three times.

ahead" or "go for it," and, in the laundry room, lunged or ran toward defendant and impaled himself on the knife. Defendant pulled out the knife, and the victim took several steps into the kitchen, where he collapsed.

The first law enforcement officer responding to the scene had observed that the victim had no weapons or other objects in his hands or near where his body lay on the floor. Despite defendant's account of a violent struggle, the investigators testified that defendant's hair and clothing were not disarranged and that he had no visible bruises or injuries other than an abrasion over one eye and a hangnail on his finger. Further, an officer who responded to defendant's residence after the stabbing testified that the house was neat, with no tipped-over furniture or signs of a struggle. Defendant told the investigators that he had made many previous calls to law enforcement to report the victim's abusive behavior toward him, but the evidence established that only two of 18 calls that defendant had placed to police since 2004 involved the victim. In one call, defendant had complained that the victim had flipped over a table, and, in the other, that he did not participate in housework.

James Terzian, a pathologist, testified that he performed an autopsy and determined that the victim had died as a result of blood loss caused by a single stab wound to the chest that was approximately 4½ inches deep and reached the right ventricle of his heart. Terzian opined that it would not have been possible for the victim to have caused this wound by impaling himself unless the knife was placed against a wall or other immovable object that prevented it from moving backwards, and that a person holding a knife would not constitute such an immovable object. He further stated that it would have been possible for the victim to move around for 20 or 30 seconds before the wound caused his death. The administrative coroner for Tioga County, who was called to the scene and was present at the autopsy, testified that the victim's body was lying in the kitchen with no weapons nearby. He stated that the victim's injuries were a stab wound in the chest and a finger abrasion, and that the victim's heart was cut in half.

Several witnesses testified on defendant's behalf that they were familiar with the victim's reputation in the community and that he had a tendency to become argumentative and verbally abusive when he had been drinking alcohol. Defendant's expert forensic pathologist testified that the victim had a very high blood alcohol level that would have impaired his judgment and coordination and interfered with his capacity to feel pain. Contradicting Terzian's testimony, he opined that it would have been possible for the victim to cause the chest wound by lunging forward against a knife held by defendant; however, he agreed with Terzian that the victim would have been able to move around or walk for 20 or 30 seconds before he collapsed. Defendant's family physician testified that he treated defendant after the stabbing for injuries to his wrist, hand and shoulder that defendant claimed were sustained during that night's altercation. Thomas Lazzaro, a forensic psychologist, testified that defendant suffered from an anxiety disorder and might also suffer from early-onset dementia that made him highly sensitive to events that threatened his safety and gave him a high tendency to misperceive events and become frightened, anxious and agitated.[2] Based upon these conditions and the altercation's circumstances, Lazzaro opined that defendant could have believed that the use of deadly physical force was necessary to protect himself.

A defendant is justified in using deadly physical force when he or she reasonably believes, as pertinent here, "that such force is necessary . . . to protect against the use or imminent use of deadly physical force" (People v Fisher, 89 AD3d 1135, 1137 [2011], lv denied 18 NY3d 883 [2012]; accord People v Gibson, 141 AD3d 1009, 1010 [2016]; see Penal Law 35.15 [1], [2]). "[I]t was the People's burden to disprove [the justification defense] by 'demonstrat[ing] beyond a reasonable doubt that defendant did not believe deadly force was necessary or that a reasonable person in the same situation would not have perceived that deadly force was necessary'" (People v Gibson, 141

_____

[2] On cross-examination, Lazzaro qualified his testimony regarding early-onset dementia, acknowledging that he had not conducted a medical evaluation and could not testify with a reasonable degree of psychological certainty to this effect.

AD3d at 1010 [internal ellipsis omitted], quoting People v Umali, 10 NY3d 417, 425 [2008], cert denied 556 US 1110 [2009]). Defendant challenges the credibility of Atwell's testimony that defendant initiated the confrontation, noting that he was impeached on cross-examination on several significant issues, including the extent to which he was able to see the stabbing. However, these discrepancies raised credibility issues for the jury to resolve (see People v Green, 121 AD3d 1294, 1295 [2014], lv denied 25 NY3d 1164 [2015]; People v Vanderhorst, 117 AD3d 1197, 1199-1200 [2014], lv denied 24 NY3d 1089 [2014]). Critically, it was undisputed that the victim was unarmed and that defendant was the first to escalate the confrontation by using a deadly weapon. On this basis, the jury could reasonably have concluded that "the predicate for the use of deadly force[, that is,] the reasonable belief that one is under deadly attack[, was] lacking" (People v Jones, 3 NY3d 491, 496 [2004]). In view of this deficiency, together with defendant's acknowledgment that he was not afraid of the victim and Atwell's testimony that he saw defendant stab the victim while the victim's arms were at his sides, we do not find that the jury's rejection of the justification defense was against the weight of the evidence (see People v Gibson, 141 AD3d at 1010-1011; People v Harden, 134 AD3d 1160, 1163-1164 [2015], lv denied 27 NY3d 1133 [2016]; People v Lowin, 36 AD3d 1153, 1155-1156 [2007], lv denied 9 NY3d 847 [2007]).

As for defendant's claim that the People failed to prove that he intended to cause serious physical injury, this "was a factual question that the jury could infer from his conduct and the surrounding circumstances," including Atwell's account of defendant's actions, the severity of the wound, the expert testimony that it could not have been inflicted by the victim impaling himself on the blade, and defendant's multiple statements that he stabbed the victim (People v Harden, 134 AD3d at 1163; see People v Gibson, 141 AD3d at 1012; People v Hamilton, 133 AD3d 1090, 1091-1092 [2015]; People v Zindle, 48 AD3d 971, 973 [2008], lv denied 10 NY3d 846 [2008]). Accordingly, we find that the verdict was not against the weight of the evidence.

Defendant next contends that County Court erred in precluding certain testimony regarding the victim's prior threats of violence, threatening conduct and reputation for violence, and that this resulted in a denial of his constitutional right to present a defense. He further contends that his counsel's failure to preserve these errors for review by asserting a constitutional right to introduce the excluded evidence constituted a deprivation of the effective assistance of counsel (see People v Angelo, 88 NY2d 217, 222 [1996]; People v Simonetta, 94 AD3d 1242, 1245 n 2 [2012], lv denied 19 NY3d 1029 [2012]).

First, in this regard, defendant challenges the exclusion of potential testimony that the victim had threatened a witness with a hammer and a nail gun. A defendant charged with homicide may "introduce evidence of the victim's prior specific acts of violence of which the defendant had knowledge, provided that the acts sought to be established are reasonably related to the crime of which the defendant stands charged" (People v Miller, 39 NY2d 543, 551 [1976]). Here, defendant did not have specific knowledge of the prior incidents, but knew only that the victim had threatened the witness with unspecified "instruments"; moreover, because there was no evidence that the victim threatened defendant or had anything at all in his hands at the time of the stabbing, the prior conduct "was not reasonably related in . . . quality to the present crime[]" (People v Sawyer, 274 AD2d 603, 607 [2000], affd 96 NY2d 815 [2001]).

Next, County Court precluded testimony that defendant had called a friend approximately two months before the incident and told her that he had locked himself in the bedroom due to the victim's behavior; the friend would have testified that she could hear the victim shouting in the background and later drove to the house to pick up defendant. Although a defendant may introduce evidence of threats made against him or her by a victim whether or not the threats were communicated to the defendant, there was no evidence here that the victim made any threats during the prior encounter (see People v Petty, 7 NY3d 277, 285 [2006]; People v Miller, 39 NY2d at 549). Moreover, the precluded testimony would have been cumulative to other testimony regarding the victim's reputation for being verbally abusive when he drank

alcohol.

Finally, defendant argues that County Court improperly precluded testimony about the victim's reputation for violence. However, the proposed testimony was that of a witness who would have said that the victim pushed him around on a single occasion, and there was no evidence that defendant was aware of this incident (see People v Fore, 33 AD3d 932, 933 [2006], lv denied 7 NY3d 925 [2006]). A defendant is not deprived of meaningful representation when his or her counsel fails to raise a claim "that has little or no chance of success" (People v Stultz, 2 NY3d 277, 287 [2004]; see People v Desmond, 118 AD3d 1131, 1135-1136 [2014], lv denied 24 NY3d 1002 [2014]). For the reasons set forth above, had the challenged issues been preserved for our review, we would have found no error.

Defendant asserts a related claim that he was deprived of a fair trial by prosecutorial misconduct, and deprived of meaningful representation by his counsel's failure to object to the alleged improprieties. As with the evidentiary challenges, a failure to raise issues that lack merit does not constitute ineffective assistance; similarly, had these challenges been preserved, we would have found no impropriety. First, defendant contends that the People improperly suggested that defendant had a duty to retreat in his own home by eliciting testimony from the interviewing officers to the effect that defendant admitted that he could have avoided the confrontation by going to a nearby relative's home, putting down the knife or leaving the house. This testimony was, however, highly probative as to whether defendant reasonably believed that he was facing imminent danger of deadly physical force, and whether the nature and extent of the force used was reasonable under the circumstances. "The evidence of alternatives was admissible since it was relevant to the reasonableness of defendant's perceptions and not to the question of whether defendant was obligated to retreat" (People v Emick, 103 AD2d 643, 658 [1984]). For similar reasons, we do not find the People's remarks during summation regarding the alternatives available to defendant to be improper. Further, the remarks during summation on Atwell's credibility were fair responses to suggestions in the defense's summation that his testimony was inconsistent and incredible, and did not constitute

improper vouching (see People v Wlasiuk, 136 AD3d 1101, 1103 [2016], lv denied 27 NY3d 1009 [2016]).  If defendant's challenges had been preserved, we would have found that the few remaining challenged remarks, even if better left unsaid, "did not rise to the flagrant and pervasive level of misconduct which would deprive defendant of due process or a fair trial" (People v Heiserman, 127 AD3d 1422, 1424 [2015] [internal quotation marks and citation omitted]).

We reject the contention that defendant received ineffective assistance when his counsel failed to object to the portion of County Court's justification instruction that addressed the definition of a "dwelling."  During the charge conference, the court advised counsel that it intended to instruct the jury on the justification defense, and the court gave defense counsel the choice whether to include a paragraph in the pattern instruction that addresses a defendant's duty to retreat in his or her home, or to entirely avoid references to the duty to retreat.  Defense counsel made the strategic choice to include this language, and, consistent with this determination, the court charged the jury that defendant was not required to retreat if he was in his dwelling and was not the initial aggressor.  Defendant now contends that the court erred by including a portion of the pattern instruction stating that "whether a particular location is part of a [d]efendant's dwelling depends on the extent to which the [d]efendant and persons actually sharing living quarters with the [d]efendant exercise[] exclusive possession and control over the area in question."  Defendant contends that this language did not apply in light of the shared residence and that, since the crime took place in a shared area of defendant's home, the language may have confused the jury and led it to conclude, incorrectly, that defendant had a duty to retreat from the confrontation.

As defendant's counsel raised no objection to the inclusion of the challenged language, this claim is unpreserved (see CPL 470.05 [2]; People v Green, 119 AD3d 23, 30 [2014], lv denied 23 NY3d 1062 [2014]).  However, if counsel had preserved the claimed error, we would not have disturbed the verdict.  Reversal on the basis of a confusing jury instruction "is appropriate — even if the standard criminal jury instruction is given — when the

charge, read as a whole against the background of the evidence produced at trial, likely confused the jury regarding the correct rules to be applied in arriving at a decision" (People v Walker, 26 NY3d 170, 174-175 [2015] [internal quotation marks, ellipses and citations omitted]). We find no such likelihood of confusion here. We agree that the parenthetical language was not applicable to defendant's shared residence (see People v Jones, 3 NY3d at 495; People v Hernandez, 98 NY2d 175, 182-183 [2002]), and thus should not have been included. Nevertheless, all of the trial testimony unequivocally described the residence where the crime occurred as defendant's home, and there was no suggestion at any time in the testimony or arguments that the shared use of the kitchen by defendant and his tenants altered that fact or gave rise to any duty to retreat. As previously noted, the evidence and arguments pertaining to alternatives available to defendant other than stabbing the victim were addressed to whether defendant was the original aggressor and whether his actions and perceptions were reasonable; the record demonstrates that no argument was made at any time that he had a duty to retreat in his own dwelling. The evidence disproving the justification defense — in particular, the undisputed proof that the victim never had or threatened to use a weapon — was overwhelming, and we find "no reasonable possibility that the verdict would have been different had the charge been correctly given" (People v Petty, 7 NY3d at 286; see generally People v Crimmins, 36 NY2d 230, 241-242 [1975]). Counsel's failure to object to this harmless error, without more, "was not so serious as to compromise defendant's right to a fair trial" and did not constitute ineffective assistance (People v Gunney, 13 AD3d 980, 983 [2004], lv denied 5 NY3d 789 [2005]; accord People v Fauntleroy, 108 AD3d 885, 887 [2013], lv denied 21 NY3d 1073 [2013]).

We find no merit in defendant's contention that he received ineffective assistance when his counsel failed to object to medical testimony describing the victim's death as a "homicide." It is well established that "[s]uch characterization improperly invade[s] the province of the jury" (People v Odell, 26 AD3d 527, 529 [2006], lv denied 7 NY3d 760 [2006]; accord People v Heath, 49 AD3d 970, 973 [2008], lv denied 10 NY3d 959 [2008]). Contrary to defendant's contention, however, counsel did promptly object

to the coroner's testimony that the victim's death was ruled a homicide, and this objection was sustained.[3]  Counsel did not object to Terzian's testimony that "[t]he manner of death, in [his] opinion, was homicide."  However, Terzian immediately qualified this testimony by stating that this was his medical opinion; he further explained the meaning of the term "manner of death" and distinguished it from the cause or mechanism of death.  In view of these qualifications, "if we were to review this error . . ., we would find it to be harmless" (People v Odell, 26 AD3d at 529).  Despite counsel's failure to object to two harmless errors, he pursued a cogent trial strategy of challenging the credibility of the only eyewitness, made appropriate motions, vigorously cross-examined the People's witnesses and advanced reasonable defenses in arguing that the death was justified or, in the alternative, caused by the victim's own actions.  Considering the evidence as a whole, we find that defendant received meaningful representation (see  People v Blake, 24 NY3d 78, 81-82 [2014]; People v Ramos, 133 AD3d 904, 909 [2015], lvs denied 26 NY3d 1143, 1149 [2016]).

Finally, defendant contends that his sentence is harsh and excessive.  We note that the sentence was eight years less than defendant could have received.  In view of the violent nature of his crime and his failure to express remorse, we find no abuse of discretion or extraordinary circumstances warranting modification in the interest of justice (see People v Hartman, 86 AD3d 711, 713 [2011], lv denied 18 NY3d 859 [2011]).

McCarthy, J.P., Rose and Mulvey, JJ., concur.


Aarons, J. (dissenting).

While I agree that the verdict was not against the weight of the evidence, in my view, defendant received the ineffective

---

[3]  The stated ground for counsel's objection was that only a physician can state a cause of death with reasonable medical certainty.

assistance of counsel when defense counsel's cumulative errors essentially nullified defendant's justification defense and removed the focus of the case away from defendant's alleged justified acts and towards a nonexistent duty to retreat. Accordingly, I respectfully dissent.

Defendant's defense centered on the theory that he was justified in stabbing the victim after their altercation. James Atwell, who resided in defendant's home along with the victim, testified that he did not see the victim act aggressively towards defendant. However, defendant, who did not testify at trial, provided a contrasting version of the events at issue through his oral statements given to the police investigators after the stabbing incident. Prior to the stabbing, defendant and the victim were involved in a verbal, profanity-laced altercation in defendant's home. This altercation escalated with the victim physically assaulting defendant and throwing him to the ground and against the fireplace and wood stove. A chair fell down but defendant explained that he subsequently picked it up because he did not like the room to be messy. Defendant went outside so that he could call 911, which he had done in the past based upon the victim's prior behavior. Defendant's calls, however, did not go through because the victim turned off the power from the inside of the house and prevented defendant's cell phone signal booster from operating.

When defendant subsequently returned inside his home, he initially was not fearful of the victim. The victim, however, continued to scream at defendant. They resumed their altercation and the victim "came at [defendant]." Defendant thus grabbed a knife from the kitchen counter out of the need to protect himself and backed away into the laundry room. Defendant told the victim to stay away from him, but the victim refused. Even though the victim was unarmed, the victim "challenged him," "egg[ed] him on after he had the knife in his hand" and told him to "go for it." The victim then lunged at defendant and impaled himself on the knife that defendant was holding. As a consequence of their altercation, defendant complained of bruising and had an abrasion above his eye and a hangnail on his finger.

James Terzian, a pathologist who performed the autopsy of the victim, testified that the victim had some bruises on the knuckles of his right hand and a small laceration on his left middle finger. Terzian also testified that the toxicology report revealed marihuana in the victim's body and that the victim had a blood alcohol level of .27.

Defendant offered the expert testimony of Thomas Lazzaro, a forensic psychologist, who testified that defendant suffered from an anxiety disorder that made him "hyper-vigilant and very aware of any circumstances that might threaten him." Lazzaro also opined, within a reasonable degree of psychological certainty, that it was reasonable for defendant to believe that he had to defend himself against serious physical injury. More critically, defendant's expert forensic pathologist testified that it was possible for the victim to have impaled himself on the knife held by defendant and that the victim's wound was "consistent with a defensive wound."

In my view and contrary to the majority's position, the evidence disproving the justification defense was not overwhelming inasmuch as the jury could have reasonably believed that defendant was justified in using deadly force to protect himself given that defendant had called the police in the past regarding the victim's behavior, defendant and the victim had a physical and verbal altercation resulting in an abrasion above defendant's eye and an injury to his finger, defendant felt the need to grab a knife to protect himself from the victim who continued to "come at him" and defendant's experts concluded that it was reasonable for defendant to believe that he had to defend himself from the victim and that the victim could have impaled himself on the knife. Indeed, these facts are in marked contrast to the events described by Atwell, the victim's 86-year-old cousin who was sitting in a wheelchair and admittedly could not see into the laundry room where the stabbing allegedly took place.

Because the justification defense was crucial to defendant, evidence of whether defendant had the option to retreat from his home should have never been brought to the jury's attention inasmuch as defendant had no such duty to retreat (see People v

Jones, 3 NY3d 491, 496 [2004]; People v Ward, 162 AD2d 566, 567 [1990]).  Defense counsel, however, allowed such evidence to be admitted at trial and argued by the People during opening and closing statements without any restraints or limiting instructions.  As such, defense counsel's inaction let the justification defense slip away before the first witness even testified.  Based upon such inaction, in my view, defendant was deprived of meaningful representation inasmuch as "[defense counsel's] assistance was [not] consistent with [that] of a reasonably competent attorney" (People v Thiel, 134 AD3d 1237, 1240 [2015] [internal quotation marks and citation omitted], lv denied 27 NY3d 1156 [2016]), and the record reveals "the absence of strategic or other legitimate explanations" for his deficient conduct (People v Caban, 5 NY3d 143, 152 [2005] [internal quotation marks and citation omitted]).

First, as defense counsel knew that defendant spoke with the police investigators after the stabbing incident at issue and that he was questioned as to whether he could have retreated from his home, no legitimate strategy can be gleaned by defense counsel's failure to request that portions of defendant's oral statements given to the police investigators be redacted to exclude any statements related to whether defendant should have retreated from his home, or, at the very least, that a limiting instruction be given with respect to such statements.  During defendant's interview, the police investigators repeatedly inquired about defendant's decision to reenter the house, when he could have walked down the road to his father's or neighbor's house.  The investigator questioned defendant at length about various scenarios involving defendant's ability to retreat from, or remain outside, his home.  The investigator further commented to defendant that it did not make sense to him that defendant returned inside the house given that he could have retreated.

Notwithstanding the prejudicial nature of these statements and comments, defense counsel made no pretrial attempt to exclude them and likewise failed to seek a limiting instruction with respect to them (see People v Dove, 287 AD2d 806, 807 [2001]).  The voluntariness of defendant's statements to the police investigators does not prevent defense counsel from seeking to redact prejudicial information therein (see e.g. People v

Letendre, 247 AD2d 796, 796-797 [1998]) and, therefore, in my view, no reasonable attorney could have thought that such a preclusion motion would not have been worth making (see People v Ramsey, 134 AD3d 1170, 1172 [2015]; People v Langlois, 265 AD2d 683, 684 [1999]). Here, as soon as the jury heard the interview wherein the investigators preyed on defendant's choice not to retreat, the idea that defendant had the option to leave his home was implanted in the juror's minds. With the jury's attention tethered to the notion that defendant should have retreated — when defendant had no obligation to do so because he was in his home when the stabbing occurred — the jury was free to disregard any of the evidence demonstrating that defendant was justified in stabbing the victim. When the central component of a defense involves portraying that a defendant was justified in stabbing a victim, detracting away from such defense was "not a misguided though reasonably plausible strategy decision but clear ineffectiveness of counsel" (People v Bell, 48 NY2d 933, 935 [1979]; People v Brugman, 111 AD2d 562, 563 [1985]).

Defense counsel also allowed the People to solicit testimony, and argue on summation, that defendant should have retreated from his own home, all once again without any objection or a request for a limiting instruction (see People v Ramsaran, 141 AD3d 865, 871 [2016], lv granted 28 NY3d 1075 [2016]). Even though the jury had already heard about defendant's chance to retreat based upon defendant's interview with the police investigators, the People specifically asked, during the direct examination of one of the investigators, "Did [defendant] say anything about whether he had the opportunity to retreat?" The investigator responded that "[defendant] said he could have retreated. He said he could have gone to a residence down the road, he could have gone back outside. And he also said that he wished he had done that." Another investigator was similarly questioned on this topic of defendant's ability to retreat and testified that defendant mentioned that he had the opportunity to leave his home before the stabbing incident. Indeed, the People expounded on this point in their summation by arguing that one of defendant's options was to leave and go down the road to his father's house as opposed to reentering his home. Such evidence of defendant's ability to retreat may have been admissible for other purposes, as the majority notes, but it was also

significantly prejudicial to defendant.  As such, it was even more imperative that defense counsel take the necessary steps to limit such prejudice.  No steps, however, were taken by defense counsel (see People v Smith, 140 AD3d 1403, 1404 [2016]; People v Ramsey, 134 AD3d at 1172; People v Fleegle, 295 AD2d 760, 762-763 [2002]; People v Langlois, 265 AD2d at 685).

Furthermore, defense counsel never objected to County Court's erroneous qualification of the home exception to the duty to retreat charge.  During the charge conference, County Court stated that it could omit any reference as to defendant's duty to retreat or have the jury instructed about the duty to retreat with the home exception.  With the issue of the duty to retreat having permeated the trial, defense counsel was essentially compelled to request the latter.  As such, after charging the jury on defendant's duty to retreat and the home exception thereto, County Court qualified the home exception by instructing the jury that "[t]he determination of whether a particular location is part of a [d]efendant's dwelling depends on the extent to which the [d]efendant and persons actually sharing living quarters with the [d]efendant exercise[] exclusive possession and control over the area in question."  The majority acknowledges that County Court should not have included this language, but views it as harmless error.  I disagree.  Defendant was entitled to have the jury charged with the correct standard of law (see People v Medina, 18 NY3d 98, 104 [2011]).  By instructing the jury that it had to determine the extent over which defendant exercised control and possession of the area in question, County Court gave the misleading impression that defendant may have had the duty to retreat from his own home.  County Court's instruction invited the jury to make a factual determination as to whether the area where the stabbing occurred was part of defendant's home when, as a matter of law, it was not required to do so (cf. People v Santarelli, 99 AD2d 594, 594 [1984]).  In other words, County Court's instruction permitted the jury to impose upon defendant a duty to retreat when, as discussed, none existed at all (see People v Emick, 103 AD2d 643, 661 [1984]; cf. People v Johns, 122 AD2d 74, 76 [1986]).

While the majority concludes that all of the trial testimony demonstrated that the stabbing took place in

defendant's home, in my view, this does not render the error harmless. It does not change the fact that County Court gave a charge that was wholly inapplicable to the facts and unnecessary as a matter of law. Moreover, County Court compounded the error by reinstructing the jury, upon its request, with the same inapplicable qualification of the home exception to the duty to retreat charge (see People v McTiernan, 119 AD3d 465, 468 [2014]; People v Primus, 178 AD2d 565, 566 [1991]). Because the justification defense was critical to defendant (see People v Phillips, 32 AD3d 1343, 1344 [2006]), and inasmuch as the evidence disproving the justification defense was sharply contested at trial and not overwhelming (see People v Powell, 101 AD3d 1369, 1373 [2012], lv denied 21 NY3d 1019 [2013]; compare People v Jones, 3 NY3d at 497), County Court's jury charge, in my view, was not harmless error (see generally People v Walker, 26 NY3d 170, 174-175 [2015]) and required an objection.

Finally, defense counsel raised no objection when Terzian testified that the victim's death was a homicide. An objection to this testimony would not have been without merit inasmuch as "[s]uch characterization improperly invaded the province of the jury" (People v Odell, 26 AD3d 527, 529 [2006], lv denied 7 NY3d 760 [2006]; see People v Heath, 49 AD3d 970, 973 [2008], lv denied 10 NY3d 959 [2008]). Nor do I view the error in Terzian expressing this opinion as harmless, because, as discussed, the evidence disproving the justification defense was not overwhelming.

In sum, defense counsel's errors — failing to seek exclusion or request a limiting instruction regarding the offending portions of defendant's statements to the police investigators concerning defendant's ability to retreat, failing to object or request a limiting instruction to the People's questions and summation pertaining to defendant's duty to retreat, failing to object to County Court's improper jury charge regarding the duty to retreat and the home exception thereto and failing to object to Terzian's testimony that the victim's death was a homicide — would not rise to the level of ineffective assistance of counsel when viewed in isolation. Cumulatively, however, they deprived defendant of meaningful representation in this case where the evidence disproving the justification defense

was not overwhelming (see People v Fisher, 18 NY3d 964, 967 [2012]; People v Bush, 107 AD3d 1302, 1303 [2013]; People v Lindo, 167 AD2d 558, 559 [1990]).  For these reasons, I would reverse the judgment of conviction and remit the matter for a new trial.


ORDERED that the judgment is affirmed.



ENTER:

Robert D. Mayberger
Clerk of the Court