People v Chappell (2020 NY Slip Op 05978)





People v Chappell


2020 NY Slip Op 05978


Decided on October 22, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: October 22, 2020

109583

[*1]The People of the State of New York, Respondent,
v
Nicholas J. Chappell, Appellant.

Calendar Date: September 15, 2020

Before: Egan Jr., J.P., Mulvey, Aarons, Pritzker and Colangelo, JJ.


Paul J. Connolly, Delmar, for appellant.
Michael A. Korchak, District Attorney, Binghamton (Rita M. Basile of counsel), for respondent.



Pritzker, J.
Appeal from a judgment of the County Court of Broome County (Dooley, J.), rendered June 7, 2017, upon a verdict convicting defendant of the crimes of murder in the second degree, attempted murder in the second degree, assault in the first degree and criminal use of a firearm in the first degree.
Defendant was charged with murder in the second degree, attempted murder in the second degree, assault in the first degree and criminal use of a firearm in the first degree, all of which stemmed from an incident on August 31, 2016 where he fatally shot victim A and wounded victim B. Following a jury trial, defendant was convicted as charged and sentenced to consecutive prison terms of 25 years to life for his conviction of murder in the second degree, 20 years for his conviction of attempted murder in the second degree, to be followed by five years of postrelease supervision, and five years for his conviction of criminal use of a firearm in the first degree. He was also sentenced to a concurrent prison sentence of 20 years, to be followed by five years of postrelease supervision, for his conviction of assault in the first degree. Defendant appeals.
Initially, contrary to defendant's contention, our independent review of the grand jury minutes reveals that County Court properly denied defendant's motion to dismiss the indictment (see People v Ferguson, 177 AD3d 1247, 1249-1250 [2019]; People v Sutherland, 104 AD3d 1064, 1066 [2013]). Defendant also argues that the verdict was against the weight of the evidence because the People failed to prove beyond a reasonable doubt that his actions were unjustified. "Given that another verdict would not have been unreasonable, we must weigh the relative probative force of conflicting testimony and the relative strength of the conflicting inferences that may be drawn from the testimony while viewing the evidence in a neutral light and giving deference to the jury's credibility assessments" (People v Williams, 161 AD3d 1296, 1296 [2018] [internal quotation marks and citations omitted], lv denied 32 NY3d 942 [2018]). As relevant here, "[a] person is guilty of murder in the second degree when . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]). In turn, "[a] conviction for attempted murder in the second degree requires proof that, with intent to cause the death of another, the defendant engaged in conduct that tended to effect the commission of that crime" (People v Greenfield, 167 AD3d 1060, 1061 [2018], lv denied 32 NY3d 1204 [2019]; see Penal Law §§ 110.00, 125.25 [1]). A conviction for assault in the first degree requires proof that, "[w]ith intent to cause serious physical injury to another person, [the defendant] causes such injury . . . by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.10 [1]). Finally, a person commits criminal use of a firearm in the first degree when he or she commits attempted murder in the second degree or assault in the first degree and he or she "possesses a deadly weapon, if the weapon is a loaded weapon from which a shot, readily capable of producing death or other serious injury may be discharged" (Penal Law § 265.09 [1] [a]; see Penal Law § 70.02 [a]).
As to the defense of justification for the use of deadly force to prevent or terminate a burglary, use of deadly physical force is permitted where "[a] person in possession or control of . . . a dwelling . . . reasonably believes that another person is committing or attempting to commit a burglary of such dwelling . . . [and] he or she reasonably believes such [force] to be necessary to prevent or terminate the commission or attempted commission of such burglary" (Penal Law § 35.20 [3]; see People v Simmons, 111 AD3d 975, 978 [2013], lv denied 22 NY3d 1203 [2014]). "This inquiry involves a subjective and objective element, i.e., it focuses on the defendant and the circumstances he or she confronted at the time of the [incident], as well as what a reasonable person in those circumstances and having [the] defendant's background and experiences would conclude" (People v Simmons, 111 AD3d at 978 [internal quotation marks and citations omitted]; see People v Wesley, 76 NY2d 555, 559 [1990]). "[W]henever justification is sufficiently interposed by [a] defendant, the People must prove its absence to the same degree as any element of the crime charged" (People v McManus, 67 NY2d 541, 546-547 [1986]; see Penal Law § 25.00 [1]; People v Williams, 161 AD3d at 1297).
It is undisputed that defendant, with a loaded shotgun, shot and killed victim A and seriously injured victim B. Defendant testified that he has known victim B for approximately six years and that victim B was previously defendant's roommate. Defendant testified that one of his siblings was violently murdered in 2009, he was the victim of a robbery in 2010 and that several burglaries occurred in his neighborhood in recent years. He implied that these things affected his judgment and played into his mindset on the day of the incident. Defendant also testified that he is legally blind in his right eye and has "pretty poor" vision in his left eye.[FN1] He explained that he wears contacts or glasses to correct the vision in his left eye,[FN2] but that the vision in his right eye is not correctible. Defendant testified that, despite his poor vision, he has a learner's permit to drive a vehicle. Defendant also testified that, at the time of the incident, he lived in an apartment on the first floor of a building and that there was one other apartment located upstairs. Defendant explained that there is a porch in front of the building and that when you enter the front door there is a foyer area with a closet directly across from the front door. There is a security keypad on the front door that requires a code to unlock the door. Photographs admitted into evidence illustrated that the door to defendant's apartment is located to the right of the closet. To the left, there is a flight of stairs leading up to the second-floor apartment. Approximately halfway up the stairs, there is a landing and then more stairs. There is a window in the first part of the stairwell. There are multiple doors at the top of the stairs, one to the second-floor apartment, another to an outdoor porch and the last goes to an attic.
Defendant explained that, on the day of the incident, he did not expect anyone to come to his apartment and that no one rang the doorbell. Defendant stated that he was in his dining room when he heard someone try to operate the security keypad on the front door multiple times until the door unlocked. Defendant testified that he called out to the perpetrator but received no response, which made him suspicious that a burglary was taking place. Not knowing where he placed his phone, defendant retrieved his loaded shotgun and announced that he was armed. Defendant approached his unlocked apartment door to lock it when the handle jiggled, and the door abruptly opened to reveal a "tall person" that defendant had never seen before. Defendant testified that the person approached him "very aggressively," prompting defendant to fire towards the perpetrator, who then fell out the front door. Defendant testified that he then went up a flight of stairs outside of his apartment to gain a better vantage point by peering out a window. At this point in time, he saw a second perpetrator, whom he did not know, at the top of the stairs who he believed to be a part of the burglary. Defendant testified that he fired his shotgun towards the second perpetrator who approached him "very aggressively."[FN3] Defendant testified that the perpetrator lunged at him, tackled and choked him and that the pair struggled when a knife, that defendant did not recognize nor did he believe to have fallen from his person, dropped to the ground. The perpetrator choked defendant until he lost consciousness. On cross-examination, it was revealed that, the day of the incident, defendant possessed a note in his pocket that read, "kill a man" and "body hacking." Defendant could not remember what the note was referencing.
Victim B, and other witnesses for the People, described a different version of events. Victim B testified that he rented a room from defendant and that, approximately a month before the incident when he was moving out, he discovered that the rent money that he had been paying to defendant was not being delivered to the landlord. According to victim B, he left some personal items behind. Victim B testified that, a month before the incident, he went to defendant's apartment to retrieve his possessions and mail but left without them because defendant made him feel uncomfortable. According to victim B, defendant texted him a few days before the incident threatening to throw out victim B's possessions and mail and threatening to show up at his workplace if victim B did not pick up his possessions by September 1, 2016. Victim B accused defendant of stealing his rent money and refused to pick up his belongings.[FN4] However, victim B testified that, on August 31, 2016, he and victim A went to defendant's apartment to pick up victim B's things.
Victim B further testified that, upon arriving at defendant's apartment and finding that his mail was not in the mailbox or on the front porch, he knocked on the front door twice rather than using the security keypad because he believed that defendant had changed the security code. Victim B stated that he could hear movement from inside the apartment and observed defendant open and look out of a window right near the front door multiple times. Victim B testified that he then asked defendant, both verbally and by text message,[FN5] whether he should go to the front or back door. A little bit later, victim B heard defendant open his apartment door and go up and down the stairwell. Defendant then opened the door to where the victims were standing, on the other side of a screen door. Victim B testified that he opened the screen door and defendant asked whether he had gotten his things, to which victim B responded that he had not. Defendant informed victim B that his things were in the stairwell, at which time victim B passed by defendant and walked up the stairs. Victim B observed some of his belongings and, when he turned around to ask defendant where his mail was, he saw defendant pointing a shotgun at victim A's head. He then saw defendant pull the trigger and victim A fell. Defendant then turned around to come at victim B onto the stairs, with the shotgun still in his hand, and victim B ran further up the stairs. As defendant began walking up the stairs, he said to victim B, "you f***ed with the wrong pussy."[FN6] Defendant fired two shots at victim B, the first missed and the second hit victim B in his left arm.[FN7] Victim B fell against defendant, the pair fell down the stairs and were wrestling around on the floor when a knife, that victim B believed was his, fell out of defendant's pants. Victim B testified that, using his uninjured arm, he choked defendant until police arrived.
A handyman, who was sitting in his truck across the street from defendant's apartment, testified that he observed the victims approach defendant's residence on the day of the incident. The handyman largely corroborated victim B's testimony, including that victim B knocked twice on the front door and that, when the victims entered, victim A was shot in the head. The handyman also testified that at least three shots were fired. The handyman called 911 and then approached the apartment, at which time he observed victim B kick away a gun that he inferred belonged to defendant, as he did not see either of the victims carrying a gun when they approached the residence. Kyle Kemak, an investigator who conducted a mobile phone forensic examination on defendant's phone, corroborated victim B's testimony regarding a "heated" text message exchanged between defendant and victim B regarding victim B's possessions. Kemak additionally testified that, five days before the incident, defendant texted his sister that he would "cut [victim B's] head off." Anthony Diles, a detective sergeant, testified regarding two interviews that he had conducted of defendant at the hospital the day of the incident. During one of those interviews, defendant stated that he was in his dining room when the perpetrators entered his apartment and that he was in his living room when he fired at them. Diles further testified that defendant never mentioned his abysmal eyesight during either of the interviews. Dianne Vertes, a consultant forensic pathologist, testified that she conducted the autopsy of victim A. The autopsy revealed that he had one gunshot wound to the head and that there was soot above the entrance wound, which is indicative of a close-range firing.
Defendant's contention that the People failed to prove beyond a reasonable doubt that his actions were unjustified is unavailing. The record reveals that the issue of justification was almost entirely based on credibility, and the jury evidently discredited defendant's version of events, to which this Court must accord appropriate deference (see People v Harris, 186 AD3d 907, 910 [2020]; People v Every, 146 AD3d 1157, 1162 [2017], affd 29 NY3d 1103 [2017]). For instance, defendant's contention that he retrieved his shotgun because he could not locate his cell phone to call 911 at the time of the shooting is belied by an investigator's testimony that defendant's cell phone was recovered from shorts that defendant was wearing at the time of the incident. Physical evidence, including the location of victim A's body on the porch and brain matter located on victim B's vehicle, which was parked in the street in front of defendant's apartment, further contradict defendant's account that he shot victim A after victim A entered his apartment and approached him aggressively. Furthermore, even if defendant's eyesight prevented him from identifying the victims, the jury could have reasonably concluded that the force that defendant used upon the unarmed victims was unjustified (see People v Every, 146 AD3d at 1162; People v Ramsay, 199 AD2d 428, 428-429 [1993], lv denied 83 NY2d 857 [1994]). Thus, both the verdict and the jury's rejection of defendant's justification defense was supported by the weight of the evidence (see People v Mamadou, 172 AD3d 1524, 1526 [2019], lv denied 33 NY3d 1106 [2019]; People v Fisher, 89 AD3d 1135, 1138 [2011], lv denied 18 NY3d 883 [2012]).
Defendant also contends that County Court committed reversible error in making unauthorized annotations to the verdict sheet. "CPL 310.20 (2) allows the trial court, when submitting two or more counts charging offenses from the same article of law, to set forth the dates, names of complainants or specific statutory language, without defining the terms, by which the counts may be distinguished. Absent a defendant's consent, any other notations on the verdict sheet offend the letter of the law" (People v McCloud, 121 AD3d 1286, 1289-1290 [2014] [internal quotation marks and citations omitted], lv denied 25 NY3d 1167 [2015]; see CPL 310.20 [2]). "Although generally the lack of an objection to the annotated verdict sheet by defense counsel cannot be transmuted into consent, it is well settled that consent to the submission of an annotated verdict sheet may be implied where defense counsel fails to object to the verdict sheet after having an opportunity to review it" (People v Johnson, 96 AD3d 1586, 1587 [2012] [internal quotations marks and citations omitted], lv denied 19 NY3d 1027 [2012]; see People v Bjork, 105 AD3d 1258, 1264 [2013], lv denied 21 NY3d 1040 [2013], cert denied 571 US 1213 [2014]).
Here, the record reveals that County Court made notations on the verdict sheet under each count, which included statutory language as well as the victims' names and the date of the offenses. The court advised the jury of the general nature of these notations and that they were for the "sole purpose" of distinguishing between the counts and that the notations were not "a substitute" for the court's full instructions on meeting the elements of each charge. Inasmuch as counts 1 and 2 charged offenses under the same Penal Law article,[FN8] County Court's notations were authorized by CPL 310.20 (2); however, the notations as to counts 3 and 4 were not (see People v McCloud, 121 AD3d at 1290).[FN9] Accordingly, defendant's consent was required. To that end, at the conclusion of the court's instructions to the jury, including an explanation of the annotations on the verdict sheet, the court explicitly asked the People and defense counsel if they had any additional requests or exceptions to the charge. Defense counsel answered in the negative. If it were apparent from the record that defendant had had an opportunity to review the verdict sheet, we would find that defense counsel's conduct constituted implied consent to the unauthorized annotations (see People v McCloud, 121 AD3d at 1290; People v Washington, 9 AD3d 499, 500-501 [2004], lvs denied 3 NY3d 675, 680, 682 [2004]; People v Gerstner, 270 AD2d 837, 837 [2000]). However, we cannot determine from the record whether defendant had an opportunity to review the verdict sheet because the charge conference was held off the record in County Court's chambers. Thus, we must reserve decision on this issue, as well as the other issues raised by defendant, and remit the matter to County Court for a reconstruction hearing to determine whether defense counsel had the opportunity to review the annotated verdict sheet (see People v Johnson, 88 AD3d 1293, 1295 [2011]; see generally People v Bowman, 137 AD3d 1484, 1485 [2016]).
Egan Jr., J.P., Mulvey, Aarons and Colangelo, JJ., concur.
ORDERED that the decision is withheld, and matter remitted to the County Court of Broome County for further proceedings not inconsistent with this Court's decision.



Footnotes

Footnote 1: An optometrist who examined defendant's eyes three years prior to the trial testified that defendant's eyesight was severely impacted to a point where his uncorrected vision in the right eye was 5/250 and left eye was 5/100.

Footnote 2: It is unclear from defendant's testimony whether he was wearing his contacts or glasses at the time of the shooting.

Footnote 3: Defendant testified that he only fired two shots, one at each victim.

Footnote 4: During cross-examination, victim B testified that two days before the incident, he texted defendant to inform him that he was not going to go over to defendant's apartment to pick up his possessions.

Footnote 5: This testimony was corroborated by Kyle Kemak, an investigator who conducted a mobile phone forensic examination on defendant's phone. Kemak also testified that defendant may not have received that message.

Footnote 6: On cross-examination, victim B admitted that, while he and victim A were waiting for defendant to come to the door, victim A called defendant a "pussy."

Footnote 7: Defendant testified that, after he was shot, his arm was "dangling" from the elbow and he has had approximately 10 surgeries to reconstruct his arm.

Footnote 8: Count 1 charged defendant with murder in the second degree pursuant to Penal Law § 125.25 and count 2 charged defendant with attempted murder in the second degree pursuant to Penal Law §§ 110.00 and 125.25.

Footnote 9: Count 3 charged defendant with assault in the first degree pursuant to Penal Law § 120.10 and count 4 charged criminal use of a dangerous weapon in the first degree pursuant to Penal Law § 265.09.