People v Sanchez (2017 NY Slip Op 08899)





People v Sanchez


2017 NY Slip Op 08899


Decided on December 21, 2017


Appellate Division, First Department


Kahn, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 21, 2017
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

John W. Sweeny, Jr., J.P.
Richard T. Andrias
Karla Moskowitz
Marcy L. Kahn
Ellen Gesmer, JJ.


2906/12 3680 

[*1]The People of the State of New York, Respondent,
v
Alexis Sanchez, Defendant-Appellant.



Defendant appeals from the judgment of the Supreme Court, Bronx County (Margaret L. Clancy, J.), rendered March 20, 2015, convicting him, after a jury trial, of murder in the second degree and criminal possession of a weapon in the second degree, and imposing sentence.




Richard T. Wojszwilo, New York, for appellant.
Darcel D. Clark, District Attorney, Bronx (Eric C. Washer and Nancy D. Killian of counsel), for respondent.



KAHN, J.


Defendant Alexis Sanchez was convicted, after a jury trial, of murder in the second degree and criminal possession of a weapon in the second degree, arising out of the shooting death of Stephen Mari. Defendant, who did not testify, put forth a justification defense based on a videotaped statement that he gave to the police giving his version of the shooting, which the People introduced into evidence to definitively place the defendant at the scene.
On this appeal, we are asked to decide whether the jury's verdict convicting defendant of murder in the second degree was against the weight of the evidence.
I. Standards of Review
Weight of the evidence review involves a two-step approach. (People v Romero, 7 NY3d 633, 643 [2006]). First, the Court must determine whether, based on all the credible evidence, an acquittal would not have been unreasonable (id.; People v Bleakley, 69 NY2d 490, 495 [1987]). If so, then the appellate court must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony (People v Danielson, 9 NY3d 342, 348 [2007]; Romero, 7 NY3d at 643; Bleakley, 69 NY2d at 495). That step is performed by weighing the evidence against the elements as charged to the jury [*2](Danielson, 9 NY3d at 349). The evidence must be of such weight and credibility as to convince the Court that the jury's finding of the defendant's guilt beyond a reasonable doubt was justified (People v Mateo, 2 NY3d 383, 410 [2004], cert denied 542 US 946 [2004]).
The relationship between the role of the jury in the finding of facts and the role of the intermediate appellate court in review of the facts has been stated as follows:
"Empowered with this unique factual review, intermediate appellate courts have been careful not to substitute themselves for the jury. Great deference is accorded to the fact-finder's opportunity to view the witnesses, hear the testimony and observe demeanor. Without question the differences between what the jury does and what the appellate court does in weighing evidence are delicately nuanced, but differences there are" (Romero, 7 NY3d at 644, quoting Bleakley, 69 NY2d at 495).
This Court has held that reversal of a judgment of conviction on weight of the evidence review is not warranted in the absence of record evidence indicating "that the jury's findings of credibility and fact were manifestly erroneous and so plainly unjustified by the evidence that rejection is required in the interest of justice'" (People v Bartley, 219 AD2d 566, 567 [1st Dept 1995], quoting People v Corporan, 169 AD2d 643, 643 [1st Dept 1991]; see People v Castillo, 223 AD2d 481, 481 [1st Dept 1996] [same]).
The defense of justification of use of deadly physical force may be raised where the defendant "believes that [another] person is using or about to use deadly physical force" (Penal Law § 35.15[2][a]) and "to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person" (Penal Law § 35.15[1]). Weight of the evidence analysis is applicable to the defense of justification, which the People are required to disprove beyond a reasonable doubt (see People v Umali, 37 AD3d 164, 165 [1st Dept 2007], affd 10 NY3d 417 [2008], cert denied 556 US 1110 [2009]; see People v Gibson, 141 AD3d 1009, 1011-1012 [3d Dept 2016]).
II. The Trial
The following facts were uncontested at trial. During the evening hours of November 2, 2011, Stephen Mari was shot in an alleyway located in the vicinity of 1523 Purdy Street in the Bronx, 130 yards from the high school defendant had attended, and left to die. There were no eyewitnesses to the actual shooting. Shortly after the shooting took place, police officers found Mari's body lying facedown in a pool of blood inside the alleyway, which was 20 feet 6 inches in length and 7 feet wide. Mari, who was 5 feet 11 inches tall and weighed 250 pounds, had sustained six gunshot wounds - one each to his head and upper left arm and four to his torso. There was no blood found on the tee shirt Mari was wearing and no fouling or stippling on the skin near any of the entrance wounds on his body. The police, who arrived on the scene shortly after the shooting, recovered a wallet from Mari's body containing Mari's identification, but no money. Police detectives also recovered eight shell casings, one of which was found just outside the alleyway.
The People's case at trial was as follows. Mamadou Bah testified that on the night of the shooting, he saw an Hispanic man wearing a hooded sweatshirt sitting alone in the driver's seat of a car which was double-parked on Purdy Street. He then witnessed the man exiting the car and proceeding toward the alleyway. Bah then heard several shots fired, and then saw the man run back from the alleyway to the car and drive off.
Ricardo Campos, a New York Police Department sergeant who was off duty on the night of the shooting, testified that on that night he was waiting in his car to pick up his girlfriend's son from school when he heard four shots fired in quick succession. Two seconds later, he heard two [*3]more shots. He walked in the direction of the shots and then saw a man run out of an alleyway, jump into a dark sports utility vehicle and drive off.
Faye Rosa, who also heard the shots, called 911. Her statement was that she told the 911 operator that she heard "four shots followed by a pause followed by four shots" but was too scared to look outside.
The People presented evidence that after the shooter fled, the investigating detectives ascertained further information from conversations with Mari's son, Stephen Mari, Jr. Mari, Jr. stated that two days before the shooting a man named "Alex" had come to Mari's house in order to buy drugs from him. Mari, Jr. stated that Mari let "Alex" into his home and told his son to make him "feel comfortable" while Mari assembled his drugs and accepted only partial payment for the drugs from "Alex," allowing him to depart amicably, with "Alex" promising to pay the balance of $35 in a couple of days. Mari, Jr. told police that "Alex" still owed Mari the money. He also mentioned that his father could bench press 350 pounds and would "manhandle" him. Using Mari's cell phone records, police identified "Alex" as defendant. A detective went to defendant's house several times, but defendant's mother told the detective that defendant was in "a program" and that she had no knowledge of his whereabouts. In fact, defendant had absconded, and his location was unknown to the police from November 2011 to August 2012.
Detective Robert Schlosser testified that he learned on August 18, 2012 that defendant was expected to arrive at a building near the intersection of Glebe and Parker Avenues to buy drugs. Detective Schlosser intercepted defendant at the building and defendant agreed to go with the detective to the precinct. Once there, defendant stated that he had used drugs and had bought them from someone named "Stephen." The detective told defendant that he wanted to talk to him about "Stephen" and defendant replied that "Stephen" had disappeared and that he didn't know where "Stephen" had gone. Detective Schlosser then told defendant that Mari had been shot and killed and that defendant was seen with Mari on the day of the murder. Defendant then admitted that he had been with Mari on the day he was murdered and had driven him to Purdy Street. Defendant further stated that he dropped Mari off at Purdy Street and never saw Mari again after that. Upon further questioning by Detective Schlosser, defendant admitted that he had shot Mari, but made verbal, written and videotaped statements to the effect that he had done so in self-defense. Detective Schlosser further testified that after the shooting, Mari's car was found parked a block from defendant's home.
Dr. Kristen Landi of the New York Office of the Chief Medical Examiner testified that she supervised the autopsy of Mari's body. She testified that the shot to Mari's head would have resulted in catastrophic brain injury and a precipitous loss of blood pressure. Additionally, Dr. Landi testified that the shot to Mari's head and another shot that injured his lumbar spine would have incapacitated him almost instantly. Dr. Landi opined that, given the lack of stippling found on Mari's tee shirt or adjacent to his torso wounds, it is unlikely that defendant fired at Mari from a distance of one foot or less. She also testified that because Mari was apparently wearing a hat when he was shot, she could not opine on the distance between the shooter and Mari's head. Although Dr. Landi further stated that the absence of stippling or fouling did not definitely prove that the muzzle of the gun was two feet or more from the site of a wound, when asked whether a gunshot fired from only one foot away would be consistent with a lack of stippling or fouling, she responded that such a scenario would be "pushing the realm of possibility." She also testified that superficial scrapes and bruises were found on the backs of Mari's hands.
Defendant did not testify at trial, but his videotaped statement was introduced by the prosecution. In that statement, defendant claimed that on the day of the shooting, Mari had come to defendant's home to collect some money defendant owed him for drugs. Defendant gave Mari $145, which was $35 short of the amount he owed Mari. Mari then became upset and hit defendant repeatedly, threatening to kill him and his family. [*4]Mari then directed defendant to get into defendant's car, telling him to move over from the driver's seat so that Mari could drive the car somewhere "to make a sale." Mari drove defendant's car to Purdy Street and then ordered defendant out of the car. They proceeded to an alleyway, where Mari pulled out a gun with his right hand and demanded the money defendant owed him. Defendant said that he did not have all of the money and Mari told defendant that he was going to kill him and pointed the gun at him while searching defendant's pockets and taking the money he had. A struggle ensued, and defendant managed to take control of the gun. Defendant pointed it at Mari and warned him to back up or he would shoot. Instead, according to defendant, Mari advanced on defendant and punched him in the right side of his face using his left hand. Defendant fired the gun once, but Mari kept punching him, so defendant fired the gun again and kept pulling the trigger to defend against Mari's attack until the gun was empty. Mari then fell to the ground, and, as he was falling, defendant claimed that he accidentally shot Mari one last time, striking him in the head. Defendant fled from the alleyway.
In further describing his departure from the scene, defendant first stated that he took his car keys from Mari when he first left him and did not return to the alleyway. Later in the videotaped statement, defendant stated that after the shooting he ran out of the alleyway to the car and, realizing that he did not have his car keys, ran back to the alleyway, took the keys out of Mari's hand, returned to the car and drove off. Upon arriving at his home, he immediately threw the gun into the garbage.
Frank Leone, called by defendant, testified that he knew both Mari and defendant, and that on the day of the shooting, Mari went to defendant's house looking for money. Leone further testified that while he was on the telephone with Mari that same day, he heard Mari threaten to "kill him if he didn't get the money." He then heard the voice of a second person whom he assumed was defendant respond that "he was going to get the money for him." On cross-examination, Leone testified that Mari often made empty threats similar to the one that he heard on the telephone.
Another defense witness, Tamara Pagan, testified that she lived on Purdy Street near the alleyway, and that while at home on the night of the shooting, she heard shots ring out. She then went to her window and saw a person run from the alleyway to a large, dark colored car and return to the alleyway. She stated that she did not know how long the man stayed in the alleyway, but that she saw him run out of it a second time, get into the car and drive away.
Sharine Talavera testified that she lived in the same house as defendant and was the wife of defendant's cousin. She further testified that on the day of the shooting, she heard a "bang" at the front door of her house, then looked outside and saw an altercation between defendant and another man outside of the house. She then observed the other man grab defendant's legs and push defendant into the passenger seat of his own car. The other man then got into the driver's seat of the car and drove off. She characterized the other man's actions as having "kidnapped" defendant. Talavera further testified that she told only defendant's aunt of the incident she had witnessed and that she decided not to call 911. She also testified that she had seen defendant on the day after the shooting and that defendant had a black eye, although when she asked him about it he replied that "everything [is] okay."
Defendant introduced medical records into evidence showing that he sought treatment for what he described as a facial injury.
At the conclusion of the trial, the court instructed the jury that in order to find defendant guilty of the crime of murder in the second degree in this case, the jury must find that defendant "caused the death of Stephen Mari," "did so with the intent to cause the death of Stephen Mari" and "was not justified" in doing so.
III. Weight of the Evidence Review
Viewing all of the record evidence in light of the first prong of the Romero-Bleakley [*5]standard, had the jury credited defendant's account of the events surrounding the shooting, it could have reasonably found that defendant was, as the trial court instructed, "justified in the use of deadly physical force, . . . hav[ing] honestly believed that it was necessary to defend himself from what he honestly believed to be the use or imminent use of such force by Steven Mari and [that] a reasonable person in the defendant's position, knowing what the defendant knew, and being in the same circumstances would have believed that too." Thus, had the jury credited defendant's statement, it would not have been unreasonable for the jury to have acquitted defendant (Romero, 7 NY3d at 643; Bleakley, 69 NY2d at 495).
Turning to the second step of the Romero-Bleakley analysis, at the outset, there is no basis for disturbing the jury's rejection of defendant's videotaped statement. Defendant's statements to Detective Schlosser were materially inconsistent, and defied credulity. The jury learned that defendant provided three different accounts of his role in the shooting, first stating that Mari had disappeared and that defendant had played no role in his disappearance, then stating that he drove Mari to Purdy Street and dropped him off there and had no further contact with him afterward, and finally, upon further questioning by Detective Schlosser, admitting that he shot Mari but claiming that he did so in self-defense. Given the magnitude of the event in the life of defendant, who had never previously been convicted of a crime, the disparity in his accounts could not reasonably have been attributable to memory lapse over the passage of several months' time. In view of the irreconcilable inconsistencies of defendant's accounts, which reasonably could be ascribed to defendant's effort to obfuscate his role in the shooting, the jury was justified in finding them incredible.
Furthermore, defendant's videotaped statement was patently implausible. It strains credulity that defendant could have wrested the pistol away from Mari, who was 5 feet 11 inches tall, weighed 250 pounds and, as corroborated by Mari Jr.'s testimony, could bench press 350 pounds even when taking methadone, and would "manhandle" his son.
Other aspects of defendant's ultimate account of what occurred at the time of the shooting, especially given the relative strength of conflicting testimony given by the People's witnesses, appear to be and were likely seen by the jury as implausible. For example, it is unlikely that Mari, who would have been holding the keys to defendant's car in his left hand and the gun in his right hand, repeatedly punched defendant in the face with his left hand while still holding the car keys. In addition, in his videotaped statement, defendant gave two conflicting accounts of his departure from the scene, first stating that he took the car keys from Mari when he first left him and did not return to the alleyway, and later stating that he ran out of the alleyway toward the car, realized he did not have the car keys, returned to the alleyway, pried the keys from Mari's hand, returned to the car and drove off. This latter version of his departure was at odds with the testimony of the independent witnesses Bah and Sergeant Campos. Although defendant's version of his departure in this latter, contradictory explanation was consistent with Pagan's testimony, weighing this aspect of defendant's account in light of other implausible aspects of his statement, including his contested claims that it was Mari who drove defendant's car to a location familiar to defendant and that Mari had held the car keys in his left hand fist, while searching him with that hand, and then pummeling defendant with one hand and holding the gun with the other, the jury was justified in rejecting both defendant's statement and Pagan's testimony as incredible.
Moreover, weighing defendant's videotaped statement against the uncontroverted fact that no money was found in Mari's wallet, and the fact that defendant made no mention of having retrieved the money in his videotaped statement, the jury was justified in rejecting his statement and, instead, drawing the stronger, conflicting inference that defendant retrieved the money from that wallet, including money Mari had allegedly taken from him. The jury could have thus concluded that recovery of the money was a motivating factor in defendant's shooting [*6]of Mari, and that defendant's failure to mention the money reflected his consciousness of guilt.
Further, Mari, Jr.'s statement was that two days before the shooting, Mari had let defendant into his home, told his son to make him "feel comfortable" while Mari assembled his drugs and then accepted only partial payment for the drugs from defendant, allowing him to depart amicably with defendant promising to pay Mari the balance of $35 in a couple of days. This testimony undermines the credibility of defendant's account that, two days later, Mari would try to kill defendant because he was $35 short of full payment, even if Mari were intoxicated by drugs, especially since no money was found on Mari's body when the police discovered it shortly after the shooting took place.
Moreover, defendant's videotaped description of his departure from his home with Mari is markedly different from the description offered by Sharine Talavera, as defendant makes no mention of Mari grabbing his legs and physically forcing defendant into his car, in the manner of a kidnapping. For this reason, the jury could have discredited both the defendant's statement and Talavera's testimony in this regard.
Defendant's contention that Mari drove him to the alleyway is likewise undermined by the fact that the shooting took place in an isolated spot known to defendant. That fact supports the conflicting inference that it was defendant who chose and directed Mari to that isolated location because he intended to shoot Mari there. Thus, the jury was justified in rejecting defendant's evidence and adopting the stronger, conflicting inferences that Mari's car was found near defendant's house because Mari encountered defendant there, and that from there defendant drove his car to Purdy Street with Mari in order to put an end to Mari's demands for money by murdering him in a narrow, dead-end alley.
The credibility of defendant's statement is further diminished by the evidence that after the shooting, defendant absconded for several months, as well as by Detective Schlosser's testimony that the police went to defendant's home and that his mother told them that defendant was "in a program," but could not identify it further. This evidence provides further justification for the jury's rejection of defendant's statement, in that defendant's flight raises the conflicting inference of consciousness of guilt on defendant's part.
Accordingly, viewing the evidence presented at trial in a neutral light (see People v Gibson, 141 AD3d at 1011), and weighing the relative probative force of the conflicting testimony and evidence, as well as the relative strength of the conflicting inferences to be drawn therefrom, and according deference to the jury's opportunity to view the witnesses, hear their testimony and observe their demeanor, this Court finds that there is no reason to disturb the jury's findings discrediting defendant's self-serving account of the shooting (Romero, 7 NY3d at 643-644).
Beyond the relative weakness of the evidence supporting defendant's version of the events in question, the weight of the affirmative evidence introduced at trial significantly favors the People. Notably, there is ample support in the record for the jury's determination to credit the statements of three objective, third-party witnesses over defendant's videotaped statement and the testimony of two of the defense witnesses. The independent eyewitness testimony of Bah and Sergeant Campos, taken together, was that they saw a man, later determined to be defendant, exit his car and enter the alleyway; heard gunshots fired in the alleyway; and then saw the same man run from the alleyway, return to his car and drive off. Furthermore, from Sergeant Campos's testimony and Ms. Rosa's statement that there were shots fired, followed by a pause, followed by more shots, and from the evidence of the position of the one shell casing found outside the alleyway, the jury could have reasonably inferred that the pause was intentional, with defendant firing initially from outside the alleyway and then pausing and firing again inside the narrow alleyway at closer range. Taken together, this testimony, statement and evidence undermines defendant's statement that he fired rapidly, continuously and repeatedly in order to [*7]stop Mari's advance toward him.
The forensic evidence presented by the People at trial, the inferences to be drawn therefrom, and the testimony presented in connection with that forensic evidence, strongly support the People's version of the events that occurred on the day of the shooting. For example, the fact that one of the eight shell casings was found outside the alleyway strongly supports the inference that defendant began shooting at Mari from outside the alleyway when there was a substantial distance between the two men. The lack of any blood or stippling on Mari's T-shirt, considered together with Dr. Landi's testimony that a shot to the head would have led to a precipitous loss of blood pressure, leaving no blood or stippling from the wounds to Mari's torso, strongly supports the inference that, contrary to defendant's videotaped statement, defendant first shot Mari in the head.
The dissent argues that no reasonable inference as to the distance between the two men can be drawn based on Dr. Landi's testimony, given her statements that Mari was apparently wearing a hat and that the absence of stippling or fouling does not definitively prove that the muzzle of the gun was two feet or more from the site of a wound. When asked whether a gunshot fired from only one foot away would be consistent with a lack of stippling or fouling, however, Dr. Landi in fact responded that such a scenario would be "pushing the realm of possibility."
Defendant highlights the testimony of Sharine Talavera in support of his version of the events leading to the shooting. As Talavera is the wife of defendant's cousin and both were living with defendant at the time, the jury could have rationally rejected her testimony as interested. Because she testified that she told only defendant's aunt about the kidnapping of defendant she claimed to have witnessed and decided not to call 911, and because her characterization of his departure did not comport with defendant's videotaped recounting of the events, the jury could have reasonably rejected her testimony as unreliable.
In support of defendant's justification defense, defendant presented medical records indicating that after the shooting he sought treatment for what he said was a facial injury. That evidence is undermined by Talavera's testimony that defendant responded that "everything [is] okay" when she asked about his black eye. Additionally, to the extent that the jury might have believed that defendant suffered any facial injuries inflicted by Mari, they were not so serious as to justify defendant's use of deadly physical force on Mari.
In any event, the nature and multiplicity of Mari's wounds (six) and defendant's own lack of serious injuries, together with the inconsistencies in defendant's own statements and the other evidence already discussed, are strong evidence in support of the jury's determination that defendant's justification defense was disproved beyond a reasonable doubt (see People v Rubin, 200 AD2d 376, 377 [1st Dept 1994], lv denied 83 NY2d 876 [1994]; People v King, 128 AD2d 806, 806 [2d Dept 1987]).
Based upon our weighing of defendant's own incredible statements and the other evidence presented by the defense against the probative force of the evidence presented by the People and the strength of the inferences to be drawn therefrom, and according deference to the jury's credibility findings, we conclude that the jury was justified in finding that the People sustained their burden of disproving defendant's justification defense beyond a reasonable doubt (People v Every, 146 AD3d 1157, 1162 [3d Dept 2017], affd 29 NY3d 1103 [2017]; see People v Gibson, 141 AD3d at 1011-1012 ["viewing the evidence in a neutral light and mindful of the deference accorded to the fact-finder[,] . . . we find no reason to disturb the jury's rejection of the justification defense"]; People v Massey, 61 AD3d 1433, 1433 [4th Dept 2009], lv denied 13 NY3d 746 [2009]).
The dissent's analysis of the issues presented on this appeal departs from the standard of review articulated by the Court of Appeals, in that it is based on a selective identification of [*8]singular items of evidence which, it concludes, support a verdict contrary to that reached by the jury. In isolating discrete portions of the overall trial testimony and evidence that it deems to be significant while ignoring the remainder of the evidence presented at trial, the dissent puts itself in the perilous position of substituting its view of the evidence for that of the jury (see Romero, 7 NY3d at 644 ["Empowered with this unique factual review, intermediate appellate courts have been careful not to substitute themselves for the jury"] [internal quotation marks omitted]). That is not the role of this Court in a weight of the evidence review, however. Rather, the proper approach is to weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony and evidence overall, while according great deference to the jury's credibility findings (id. at 643-644). Here, upon weighing the relative probative force of the conflicting trial testimony and evidence and the inferences to be drawn from that evidence overall, and according great deference to the jury's credibility findings, it is clear that the selected items of testimony and evidence upon which the dissent narrowly focuses do not outweigh the probative force of the testimony and evidence supporting a guilty verdict.
For example, the dissent casts Leone's testimony that he overheard Mari on the telephone threatening to kill someone with him, whom Leone assumed was defendant, as well as defendant's statement that Mari threatened to kill defendant and his family, as supportive of defendant's justification defense. The dissent fails to consider, however, that Mari had a habit of making empty threats, a fact that undermines the strength of Leone's and defendant's statements in this regard. The dissent also ignores other aspects of Leone's testimony from which inferences favorable to the People could be derived. For example, from defendant's statement to Mari, overheard by Leone, that "he [defendant] was going to get the money for him [Mari]," the jury could have reasonably inferred that defendant was attempting to lure Mari into his car so he could bring him to the alleyway and shoot him.
Accordingly, weighing the evidence against the elements of the crime of murder in the second degree as charged to the jury (Danielson, 9 NY3d at 349), and according great deference to the jury's credibility findings (Romero, 7 NY3d at 644), this Court finds that the weight and credibility of the evidence are such as to convince us that the jury was justified in finding proof beyond a reasonable doubt that defendant caused the death of Stephen Mari with the intent to do so, and that the People disproved defendant's justification defense beyond a reasonable doubt. Therefore, we conclude that the jury's verdict of guilty was not against the weight of the evidence (see Mateo, 2 NY3d at 410).
IV. Suppression Claim
Supreme Court properly denied defendant's motion to suppress his statements to the police. The confidential informant was reliable, as the information he provided was consistent with the details already learned by the detectives during their investigation (see People v DiFalco, 80 NY2d 693, 697 [1993]). There was a sufficient basis for the confidential informant's knowledge, as he personally knew both Mari and defendant and overheard defendant admit his involvement in the shooting (see Matter of Dominique P., 812 AD3d 478 [1st Dept 2011]). Thus, both prongs of the Aguilar-Spinelli test (Spinelli v United States, 393 US 410 [1969]; Aguilar v Texas, 378 US 108 [1964]) were satisfied, and there was probable cause to arrest defendant, leaving no basis to suppress his statements.
V. Excessive Sentence
Defendant's excessive sentence claim is unavailing. Supreme Court considered defendant's substance abuse problems, his lack of a criminal record and his remorse for what he had done, and it providently determined that an 18-year to life prison sentence was warranted.
Accordingly, the judgment of the Supreme Court, Bronx County (Margaret L. Clancy, J.), rendered March 20, 2015, convicting defendant, after a jury trial, of murder in the second degree [*9]and criminal possession of a weapon in the second degree, and sentencing him to an aggregate term of 18 years to life, should be affirmed.
All concur except Moskowitz and
Gesmer, JJ. who dissent in an Opinion
by Moskowitz, J.




MOSKOWITZ, J. (dissenting)


I respectfully dissent, as I believe that the jury's verdict was against the weight of the evidence. Defendant's self-defense claim had ample support in the record, and the People presented no evidence directly refuting that theory. Accordingly, I would reverse and dismiss the indictment.
Decedent Stephen Mari, a drug dealer, was shot and killed on Purdy Avenue in the Bronx. Mari's son testified that, on the night that Mari was killed, a man named Alex had arrived at the Mari home, seeking to buy drugs; the police eventually found defendant by way of Mari's cell phone records.
In his statement to police, which the People offered into evidence, defendant stated that in fact, he had killed Mari in an argument over drugs. According to defendant, Mari came to defendant's home looking for money that defendant purportedly owed for a drug purchase. Defendant said that Mari physically assaulted him and threatened to kill not only defendant, but also defendant's family.
Defendant said in his statement that Mari then told defendant to get into his car, and Mari drove the car to Purdy Street in the Bronx. In an alleyway, Mari pulled out a handgun and again demanded money. When defendant responded that he did not have all the money he owed for the drugs, Mari again threatened to kill him. Mari and defendant then struggled, and during that struggle, defendant was able to take the gun from Mari. According to defendant, he warned Mari to step back or be shot. Mari did not step back, but instead advanced and punched defendant; defendant then fired the gun numerous times until Mari fell to the ground. Defendant then fled the alleyway. Toxicology analysis revealed the presence in Mari's system of Zyrtec, methadone, morphine, and cocaine, and the pathologist who performed the autopsy opined that at the time of his death, Mari, who was 5 feet 11 inches tall and weighed 250 pounds, was acutely intoxicated.
We agree with defendant that the verdict was against the weight of the evidence (see People v Danielson, 9 NY3d 342, 348—349 [2007]). The only direct evidence of the homicide was defendant's statement that he believed Mari was about to shoot defendant over a drug debt, that defendant took away Mari's pistol in a struggle, and that defendant repeatedly fired at the deceased, who was advancing on defendant in an effort to regain the weapon. Other evidence corroborated defendant's statement to police. One witness, a friend of Mari's son, testified that Mari threatened to kill defendant for the money owed, thus corroborating defendant's claim of the threats. Further, after the murder, Mari's car was found around the corner from defendant's home, substantiating defendant's theory that Mari came there to collect the debt. Medical records also showed that Mari had abrasions on his hand and defendant had a black eye, thus supporting defendant's claim that he and Mari struggled. By contrast, none of the People's evidence, either testimonial or forensic, directly refuted defendant's self-defense claim.
Although the majority correctly notes that there was no stippling on Mari's wounds, they do not accurately recount the pathologist's testimony on that topic. The pathologist did note that the lack of stippling would normally indicate that the gun must have been more than two feet from the site of the injury. The pathologist also noted, however, that Mari was apparently wearing a hat when he was shot, thus preventing the pathologist from opining on the distance between the shooter and Mari's head injury. Further, although there was no evidence of fouling [*10]or stippling on the skin near the other entrance wounds on Mari's body, the pathologist agreed that, depending upon the ammunition and weapon, stippling may not be present even for weapons fired from close range. In any event, even if defendant had shot Mari from two feet away, that evidence would not be inconsistent with defendant's account that he tried to distance himself from Mari after the struggle for the gun and that Mari continued to advance upon him even after Mari was shot.
The majority's analysis also proceeds from the incorrect premise that a weight of the evidence review requires us to view the evidence in the light most favorable to the People. That is the standard to be applied when we review the legal sufficiency of the People's evidence, which requires us to "marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof" (Danielson, 9 NY3d at 349). By contrast, weight of the evidence review allows this Court to sit, in effect, "as a thirteenth juror" (id. at 348) without viewing the evidence in the light most favorable to the People, and is a "unique factual review" power possessed solely by the intermediate appellate court (People v Bleakley, 69 NY2d 490, 495 [1987]).
When the jury has been charged with the defense of justification, the People bear the burden of proving beyond a reasonable doubt that the defendant was not justified (Matter of Y.K., 87 NY2d 430, 433 [1996]). Here, the evidence corroborating defendant's statement outweighed the minimal evidence tending to contradict it. Although defendant fired many shots, and the infliction of numerous wounds is often indicative of homicidal intent and the lack of justification, on the facts of this case, the deceased's 250-pound size, strength, and high level of drug intoxication tended to explain defendant's need to fire at the deceased rapidly and repeatedly in order to stop his advance. Moreover, the deceased's threats to kill defendant supported the reasonableness of defendant's belief that deadly force was necessary (People v Morgan, 99 AD3d 622, 623 [1st Dept 2012]; see also Penal Law § 35.15[2]; Y.K., 87 NY2d at 433-434). Under these circumstances, in the exercise of our factual review power "in effect, as a second jury" (People v Delamota, 18 NY3d 107, 117 [2011]), we find that the People did not disprove defendant's justification defense beyond a reasonable doubt.
Finally, the majority's suggestion that the jury could have drawn an adverse inference from defendant's exercise of his right not to testify is completely at odds with the Criminal Procedure Law and the jurisprudence of the Court of Appeals (CPL300.10[2]; People v Britt, 43 NY2d 111, 113-115 [1977]). Defendant requested, and the trial court properly gave, a "no inference" charge.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: DECEMBER 21, 2017
CLERK